724 F.Supp. 955 (1988)
UNITED STATES of America, Plaintiff,
v.
FLEET FACTORS CORP., Clifford Horowitz and Murray Newton, Defendants.
FLEET FACTORS CORP., Third-Party Plaintiff,
v.
Robert KOLODNEY, as Trustee in Bankruptcy of Swainsboro Print Works, Inc., Third-Party Defendant.
Civ. A. No. CV687-070.
United States District Court, S.D. Georgia, Statesboro Division.
December 22, 1988.
*956 *957 William A. Weinischke, G. Stephen Manning, Jon A. Mueller, Environmental Enforcement Section, Roger Marzulla, Acting Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Kenneth C. Etheridge, Asst. U.S. Atty., Savannah, Ga., Barry P. Allen, Asst. Regional Counsel, U.S. EPA, Atlanta Ga., Edmund G. Booth, Jr., Asst. U.S. Atty., Augusta, Ga., for plaintiff.
Laurice Firenze, Douglas J. Good, Ruskin, Schlissel, Moscou, Evans & Faltischek, Mineola, N.Y., Richard E. Miley, Augusta, Ga., for defendant Fleet Factors Corp.
Charles B. Merrill, Jr., Merrill & Stone, Swainsboro, Ga., for defendant Clifford Horowitz.
Murray Newton, Severna Park, Md., pro se.
Cecil A. Citron, Sherman, Citron & Karasik, New York City, for third-party defendant Robert Kolodney.

ORDER
BOWEN, District Judge.
Before the Court are (1) plaintiff's motion for partial summary judgment on the issue of liability against defendants Clifford Horowitz ("Horowitz"), Murray Newton ("Newton"), and Fleet Factors Corporation ("Fleet"); and (2) defendant Fleet's motion for summary judgment. A motion hearing with oral argument was conducted August 11, 1988.

FACTS
I will summarize the facts as to which there is no genuine dispute. From approximately 1963 until February, 1981, Swainsboro Print Works, Inc. ("SPW"), or its predecessor in interest, operated a cloth printing facility on its premises in Swainsboro, Georgia. Defendants Clifford Horowitz and Murray Newton were the only shareholders of SPW at the time it ceased operations. They were actively involved in the management of SPW until that time. In 1976, SPW and Fleet entered into a factoring agreement in which Fleet agreed to advance funds against the assignment of SPW's accounts receivable. As collateral for these advances, Fleet also obtained a security interest in all of SPW's equipment, inventory, and fixtures. As additional collateral, Fleet was granted a security interest in the SPW plant or facility ("facility") evidenced by a deed to secure a debt conveying title to the realty. Although Fleet foreclosed on its security interest in some of SPW's inventory and equipment in May, 1982, Fleet never foreclosed on the real property. The facility was conveyed to Emanuel County, Georgia, on July 7, 1987, at a foreclosure sale resulting from SPW's failure to pay state and county taxes.
The financing arrangement between Fleet and SPW continued until August, 1979, when SPW filed for Chapter 11 bankruptcy. Fleet continued to finance SPW as debtor-in-possession on similar terms pursuant to a court approved factoring agreement.
On February 27, 1981, SPW ceased operations at the facility. Just prior to that *958 date, Fleet had advised SPW's principals that it would not advance additional funds to SPW because SPW's account already was overadvanced, that is, SPW's debt to Fleet exceeded Fleet's estimate of the value of SPW's accounts receivable. SPW wound down its operation by selling off some remaining inventory. Fleet continued to collect on the accounts receivable assigned to it under the chapter 11 factoring agreement. Subsequently, in December, 1981, SPW was adjudicated a bankrupt under chapter 7 of the bankruptcy code, and a trustee was appointed to supervise the liquidation of assets. The trustee assumed the usual statutory powers and title to the debtor's property.
When SPW ceased operations, there were approximately 20-25 million yards of cloth at the facility. SPW had printed substantially all of the goods according to specific customers' orders. SPW retained a small crew of no more than 12 to 15 people to wind up the affairs of the company and to ship the remaining goods. During the liquidation of the remaining inventory, Fleet continued to check the credit of SPW's customers before SPW shipped the goods to the customers. This did not represent any change in Fleet's normal practice as a secured lender. SPW forwarded the funds it received to Fleet as partial payment for its post-chapter 11 debt.
After obtaining bankruptcy court approval in May, 1982, Fleet foreclosed on its security interest in some of SPW's inventory and equipment and contracted with Baldwin Industrial Liquidators, Inc. ("Baldwin") to conduct an auction and sell the inventory and equipment. Baldwin conducted a public auction on June 22, 1982, at which Baldwin sold some, but not all, of SPW's inventory and equipment for Fleet. Baldwin sold the collateral "as is" and "in place", and removal was the responsibility of the purchasers.
On August 31, 1982, Clifford Greenside signed a document in his capacity as a representative of Fleet that permitted Nix Riggers ("Nix") to remove the unsold equipment and the equipment that the purchasers had not removed after the public auction. As consideration for this right, the August 31, 1982, document directed Nix "to leave the premises in `broom clean' condition." The August 31, 1982, document allowed Nix up to 180 days, which could be extended in writing, to complete the terms and conditions of that document. Nix left the facility in or around December, 1983.
Although there is no genuine dispute concerning the foregoing facts, there is a genuine dispute concerning many of the events that surrounded the June 22, 1982, auction. Plaintiff contends that Baldwin moved fifty-five gallon drums away from the sales area before the auction. Plaintiff alleges that shortly before the auction the facility contained 400-500 leaking and rusting fifty-five gallon drums containing dyes and chemicals. Plaintiff asserts that the removal of equipment or machinery by Nix or purchasers of equipment at the auction disturbed asbestos that allegedly was on the pipes that were connected to the equipment or machinery.
In addition to disputing plaintiff's version of the events surrounding the auction and subsequent removal of the equipment and machinery at the facility, Fleet argues that plaintiff has not produced any credible evidence that the material around the pipes that were connected to the machinery and equipment was asbestos. Defendant alternatively contends that even if plaintiff incurred response costs for chemicals or asbestos that were in the facility when plaintiff conducted a site inspection on January 20, 1984, any improper disposal of environmental contaminants already had occurred before Fleet used the facility to foreclose on SPW's inventory and equipment. Cf. 42 U.S.C. § 9607(a)(2) (West Supp.1988) (providing that an operator of a facility is not liable for response costs unless he operated the facility "at the time of disposal" of a hazardous substance). There is no genuine dispute that neither Fleet nor its agents entered the facility as an operator or otherwise operated the facility before Baldwin conducted an auction at the facility on June 22, 1982, or after Nix left the facility in or around December, 1983.
*959 On January 20, 1984, plaintiff, through the Environmental Protection Agency ("EPA"), inspected the facility. Plaintiff alleges that it found 700 fifty-five gallon drums containing toxic chemicals. Plaintiff alleges that the toxic chemicals that it found were an immediate threat to public health and the environment. Based on this conclusion, the EPA initiated the first of a two-part response to the alleged environmental threat. Between February 6-24, 1984, the EPA disposed of the solutions in the fifty-five gallon drums.
After assessing the condition of the asbestos allegedly found at the facility, the EPA concluded that the asbestos problem, if unabated, presented a serious threat to public health and the environment. Therefore, between June 12, 1984, and July 11, 1984, the EPA conducted the second phase of its response to the alleged environmental threat and removed forty-four truck loads of material containing asbestos to an approved landfill. Plaintiff alleges that it incurred costs of almost $400,000 in both phases of its response to the alleged environmental threat at the facility.

STANDARD OF REVIEW
Summary judgment is only appropriate if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When the moving party's motion for summary judgment has pierced the pleadings of the opposing party, the burden then shifts to the opposing party to demonstrate that a genuine issue of fact exists. Cole v. Elliott Equip. Corp., 653 F.2d 1031, 1033 (5th Cir.1981) (citing Fed.R. Civ.P. 56(e)). A party cannot carry this burden by relying on conclusory allegations in the pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); Fed.R.Civ.P. 56(e)). A federal court may not grant summary judgment, however, unless there is only one reasonable conclusion concerning the verdict. Id. 477 U.S. at 250-52, 106 S.Ct. at 2511-12. Moreover, federal courts should resolve all reasonable doubts concerning the factual submissions in favor of the party opposing summary judgment. Casey Enter. v. American Hardware Mut. Ins. Co., 655 F.2d 598, 602 (5th Cir.1981). With these principles in mind, I will decide the cross motions for summary judgment in this case.

DISCUSSION
Plaintiff brought this action against defendants pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 (1982 and West Supp.1988), as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499, 100 Stat. 1613. The relevant provisions of CERCLA provides that the current owner and operator of a facility, or, any person who owned or operated the facility at the time hazardous substances were disposed of, is liable for any response costs of plaintiff to remedy a release or threatened release of a hazardous substance. See 42 U.S.C. § 9607(a)(1)-(2) & (4) (West Supp.1988).
The Court initially will address plaintiff's motion for partial summary judgment against Fleet on the issue of liability and Fleet's cross motion for summary judgment against plaintiff.
To prevail under CERCLA, plaintiff must establish that: (1) Defendant falls within one or more of the classes of liable persons described in 42 U.S.C. § 9607(a)(1)-(4) (West Supp.1988); (2) A "release" or "threatened release" of a "hazardous substance" has occurred or is occurring; and (3) The release or threatened release has caused the United States to incur "response costs." See New York v. Shore Realty Corp., 759 F.2d 1032, 1043-48 (2d Cir.1985); 42 U.S.C. § 9607(a)(1)-(4) (West Supp.1988).
Of the three elements just described, the element that Fleet most vigorously contests is the first element, which *960 requires the government to establish Fleet's inclusion in one of the classes of liable persons. Plaintiff contends that Fleet is within the class of liable persons described as "the owner and operator of a facility." 42 U.S.C. § 9607(a)(1) (West Supp.1988). This provision obviously refers to the owner of the facility on July 9, 1987, the date plaintiff filed its complaint. CERCLA defines "owner and operator ... in the case of any facility, title or control of which was conveyed to a unit of State or local government, [as] any person who owned, operated or otherwise controlled activities at such facility immediately beforehand." Id. § 9601(20)(A). Emanuel County's tax foreclosure of the facility occurred on July 7, 1987. Nix left the facility in or around December, 1983. Fleet never foreclosed on its security interest in the facility. Neither Fleet nor any of its putative agents had any access, or other control, or engaged in any activities at the facility after Nix left the facility in or around December, 1983. Based on the undisputed facts, I conclude as a matter of law that Fleet did not own, operate or otherwise control activities at the facility immediately before the tax foreclosure. Accordingly, Fleet is not in the class of liable persons described in 42 U.S.C. § 9607(a)(1) (West Supp.1988).
Plaintiff alternatively argues that Fleet is in the class of liable persons described in 42 U.S.C. § 9607(a)(2) (West Supp.1988). That provision imposes CERCLA liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." Id. For the purpose of the foregoing provision, CERCLA excludes from the definition of "owner or operator" any "person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." Id. § 9601(20)(A) (emphasis added). I interpret the phrases "participating in the management of a ... facility" and "primarily to protect his security interest," to permit secured creditors to provide financial assistance and general, and even isolated instances of specific, management advice to its debtors without risking CERCLA liability if the secured creditor does not participate in the day-to-day management of the business or facility either before or after the business ceases operation. Id.; cf. United States v. Mirabile, 1985, Envtl. L.Rep. 10994, 10995 (E.D.Pa. Sept. 4, 1985) (holding that secured creditor exclusion from CERCLA liability applies if secured creditor "does not become overly entangled in the affairs of the actual owner or operator of a facility").
Plaintiff concedes that Fleet never owned the facility within the meaning of CERCLA. Plaintiff argues, however, that Fleet's activities at the facility both before and after Baldwin entered the facility to prepare for, and conduct the auction constituted participation in the management of the facility sufficient to impose CERCLA liability on Fleet. I first will address the period of time between 1976 when Fleet commenced its relationship with SPW and shortly before June 22, 1982, when Baldwin entered the facility. I have carefully reviewed plaintiff's factual submissions and argument concerning that period and defendants countervailing submissions and argument. I have resolved all doubts in the factual record for that period in favor of plaintiff, the non-moving party.
I conclude as a matter of law that Fleet's activities at the facility did not rise to the level of participation in management sufficient to impose CERCLA liability on Fleet for its activities before Baldwin entered the facility to prepare for, and conduct, the auction.
I now will discuss Fleet's activities at the facility between the time that Baldwin entered the facility to prepare for and conduct the June 22, 1982, auction and the time that Nix finally left the facility in or around December, 1983.
Plaintiff alleges that Baldwin moved the barrels that allegedly contained hazardous substances before Baldwin conducted the public auction. Plaintiff contends that after the auction, Baldwin auctioned some, but not all, of the machinery and equipment *961 as is, and in place, and permitted the purchasers to remove the equipment and machinery that they had purchased. Plaintiff asserts that after the auction Fleet signed a document that permitted Nix to have access to the facility for 180 days and to remove any remaining machinery and equipment that either was not sold at the auction or was not removed by the purchaser. Plaintiff maintains that friable asbestos was knocked loose from the pipes connected to the machinery and equipment by either the purchasers of the equipment at the auction or Nix. Plaintiff alleges that the condition of the chemicals and the asbestos in the facility after Baldwin, Nix, and the purchasers concluded their business constituted an immediate risk to public health and the environment for which it incurred response costs. Plaintiff concludes that Fleet is liable for those response costs under CERCLA.
Fleet genuinely disputes the foregoing material facts alleged by plaintiff. I conclude that the foregoing genuinely disputed facts, and other genuinely disputed facts that I have not mentioned, precludes me from granting the cross motions for summary judgment between plaintiff and Fleet. Accordingly, plaintiff's motion for partial summary judgment against Fleet on the issue of liability and Fleet's motion for summary judgment are DENIED.
I now will address plaintiff's motion for partial summary judgment against Horowitz and Newton on the issue of liability.[*] I will summarize the relevant facts that I find are not genuinely disputed. On February 27, 1981, SPW ceased operations. Both before and after that date, Horowitz and Newton actively managed the facility. Horowitz and Newton each held fifty percent of the shares of SPW. Both Horowitz and Newton managed the facility for SPW as debtor-in-possession pursuant to chapter 11 of the bankruptcy code until December, 1981, when SPW was adjudicated a bankrupt under chapter 7 of the bankruptcy code. There were at least some chemicals in fifty-five gallon drums in the facility at the time that Horowitz and Newton ceased actively managing the facility. The chemicals in the fifty-five gallon drums were hazardous substances within the meaning of CERCLA. Horowitz and Newton originally procured the fifty-five gallon drums containing hazardous chemicals that the EPA found in the facility for the purpose of operating SPW's cloth printing business.
Horowitz and Newton fall within the class of liable persons described as those who owned or operated a facility "at the time of disposal of any hazardous substance." 42 U.S.C. § 9607(b)(3) (1982). Both Horowitz and Newton assert, however, the third-party defense to CERCLA liability. See id. § 9607(b)(3). The third-party defense provides that a person who falls within one of the classes of liable persons under CERCLA may avoid liability if he establishes "by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant...." Id. (emphasis added). Horowitz argues that Fleet was solely responsible for the release of hazardous substances at the facility. Newton makes a similar claim in his deposition testimony. Horowitz and Newton claim that Fleet told them not to sell or otherwise dispose of the chemicals at the facility because the chemicals possibly were marketable and Fleet had a security interest in the chemicals. Even if that allegation were true, there is no allegation that Horowitz and Newton, in *962 their capacity as active managers of SPW as a debtor-in-possession, did not have, or could not have obtained bankruptcy court approval to sell or otherwise properly dispose of the hazardous chemicals in the facility after SPW ceased operations. Accordingly, based on the foregoing facts that are not genuinely disputed, I find as a matter of law that Horowitz and Newton are not entitled to the third-party defense to CERCLA liability with respect to plaintiff's response costs for the chemicals contained in the fifty-five gallon drums because a third party was not solely responsible, to the exclusion of Horowitz and Newton, for the release or threatened release of the hazardous substances contained in the fifty-five gallon drums. Therefore, plaintiff's motion for partial summary judgment against Horowitz and Newton on the issue of liability is GRANTED with respect to plaintiff's response costs for removing the hazardous substances found in the fifty-five gallon drums.
With respect to the asbestos that EPA found at the facility in 1984, any environmental hazard created by the asbestos could have occurred solely in connection with the removal of machinery and equipment by either the purchasers at the foreclosure sale arranged by Fleet or by Nix pursuant to his agreement with Fleet. Therefore, a genuinely disputed factual issue exists concerning whether Fleet, Baldwin, Nix, and the purchasers of the machinery and equipment at the facility solely caused any environmental hazard created by the asbestos at the facility when they removed the machinery and equipment. Accordingly, plaintiff's motion for partial summary judgment against Horowitz and Newton on the issue of liability is DENIED with respect to plaintiff's response costs for removing the asbestos from the facility.

CERTIFICATION
No federal appellate court has addressed the legal issues or factual applications addressed in this order. Pursuant to 28 U.S.C. § 1292(b) (West Supp.1988) (section 1292(b)), federal district courts have authority to certify the issues in an order for interlocutory appeal. Section 1292(b) was passed to "aid in the disposition of cases before the district courts of the United States by saving useless expenditure of court time...." S.Rep. No. 2434, 85 Cong.2d Sess. 3-4. The decision concerning whether or not to allow an interlocutory appeal is within the discretion of the district court. Id. A district court only should allow such appeals in exceptional circumstances. H.R.Rep. No. 1667, 85th Cong., 2d Sess. 1-2. This case, however, is appropriate for section 1292(b) certification.
I find that this order disposes of controlling questions of law concerning which there is substantial doubt including, but not limited to, my construction of CERCLA's definition of "owner and operator" and the secured lender exemption contained in that definition; my construction of the CERCLA provisions describing the classes of liable persons; and my construction of the scope of the third-party defense to CERCLA liability. I also find that an immediate appeal from this "order may materially advance the ultimate termination of [this] litigation...." 28 U.S.C. § 1292(b) (West Supp.1988). If this order were modified or reversed on appeal after trial, a new trial that would waste scarce judicial resources likely would be necessary.
For the foregoing reasons, pursuant to section 1292(b), I certify that this case is appropriate for interlocutory appeal. If any party to this case requests an interlocutory appeal pursuant to section 1292(b), all proceedings in this case hereby are STAYED. The stay shall commence on the date that any party applies for an interlocutory appeal in the Court of Appeals and shall conclude on the date that the Court of Appeals either disposes of the interlocutory appeal on its merits or denies all applications for interlocutory appeal.

CONCLUSION
To recapitulate: (1) Plaintiff's motion for partial summary judgment against Fleet on the issue of liability is DENIED; (2) Fleet's motion for summary judgment is DENIED; *963 (3) Plaintiff's motion for partial summary judgment against Horowitz and Newton on the issue of liability is GRANTED with respect to plaintiff's response costs for removing the hazardous substances found in the fifty-five gallon drums; (4) Plaintiff's motion for partial summary judgment against Horowitz and Newton on the issue of liability is DENIED with respect to plaintiff's response costs for removing the asbestos from the facility; (5) This case hereby is CERTIFIED as appropriate for interlocutory appeal pursuant to section 1292(b); and (6) All proceedings in this case are STAYED, commencing on the date that any party applies for an interlocutory appeal in the Court of Appeals and concluding on the date that the Court of Appeals either disposes of the interlocutory appeal on its merits or denies all applications for interlocutory appeal.
ORDER ENTERED.
NOTES
[*] Clifford Horowitz filed a memorandum in opposition to plaintiff's motion for partial summary judgment on July 6, 1988. On August 4, 1988, this Court notified all parties in this case of an August 11, 1988, hearing on plaintiff's May 20, 1988, motion. I considered Mr. Horowitz's submission and oral argument before ruling on plaintiff's motion for partial summary judgment. Murray Newton, who elected to proceed pro se after filing several submissions through his former attorney, Charles B. Merrill, Jr., Esq., however, has not responded to plaintiff's motion for partial summary judgment, nor did Mr. Newton appear at the August 11, 1988, hearing on plaintiff's motion. Nevertheless, Fed.R. Civ.P. 56(c) permits this Court to grant summary judgment against Mr. Newton, if appropriate, because a hearing on plaintiff's motion was held over ten (10) days after plaintiff filed its motion.