901 F.2d 1550
 31 ERC 1465, 58 USLW 2713, 20
Bankr.Ct.Dec. 977,
20 Envtl. L. Rep. 20,832
 UNITED STATES of America, Plaintiff-Appellee,
v.
FLEET FACTORS CORP., Defendant-Third Party Plaintiff-Appellant,
Clifford Horowitz and Murray Newton, Defendants,
Robert Kolodney, Esq., as Trustee of Swainsboro Print Works,
Inc., Debtor, Third Party-Defendant.
 No. 89-8094.
 United States Court of Appeals,
Eleventh Circuit.
 May 23, 1990.
As Amended May 29, 1990.
 
 Richard E. Miley, Nixon, Yow, Waller & Capers, Augusta, Ga., Douglas J. Good, Laurice Firenze, Ruskin, Schlissel, Moscou, Evans & Faltischek, Mineola, N.Y., for Fleet Factors Corp.
 Donald A. Carr, Acting Asst. Atty. Gen., Anne S. Almy, Jennifer A. Haverkamp, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before VANCE* and KRAVITCH, Circuit Judges, and LYNNE**, Senior District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Fleet Factors Corporation ("Fleet") brought an interlocutory appeal[1] from the district court's denial of its motion for summary judgment in this suit by the United States to recover the cost of removing hazardous waste from a bankrupt textile facility. The district court denied summary judgment because it concluded that Fleet's activities at the facility might rise to the level of participation in management sufficient to impose liability under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. Secs. 9601-57 (1982 & West Supp.1988), despite the statutory exemption from liability for holders of a security interest. We agree with the district court that material questions of fact remain as to the extent of Fleet's participation in the management of the facility; therefore, we affirm the denial of Fleet's summary judgment motion.
 
 FACTS
 
 2
 In 1976, Swainsboro Print Works ("SPW"), a cloth printing facility, entered into a "factoring" agreement with Fleet in which Fleet agreed to advance funds against the assignment of SPW's accounts receivable. As collateral for these advances, Fleet also obtained a security interest in SPW's textile facility and all of its equipment, inventory, and fixtures. In August, 1979, SPW filed for bankruptcy under Chapter 11. The factoring agreement between SPW and Fleet continued with court approval. In early 1981, Fleet ceased advancing funds to SPW because SPW's debt to Fleet exceeded Fleet's estimate of the value of SPW's accounts receivable. On February 27, 1981, SPW ceased operations and began to liquidate its inventory. Fleet continued to collect on the accounts receivable assigned to it under the Chapter 11 factoring agreement. In December 1981, SPW was adjudicated a bankrupt under Chapter 7 and a trustee assumed title and control of the facility.
 
 
 3
 In May 1982, Fleet foreclosed on its security interest in some of SPW's inventory and equipment, and contracted with Baldwin Industrial Liquidators ("Baldwin") to conduct an auction of the collateral. Baldwin sold the material "as is" and "in place" on June 22, 1982; the removal of the items was the responsibility of the purchasers. On August 31, 1982, Fleet allegedly contracted with Nix Riggers ("Nix") to remove the unsold equipment in consideration for leaving the premises "broom clean." Nix testified in deposition that he understood that he had been given a "free hand" by Fleet or Baldwin to do whatever was necessary at the facility to remove the machinery and equipment. Nix left the facility by the end of December, 1983.
 
 
 4
 On January 20, 1984, the Environmental Protection Agency ("EPA") inspected the facility and found 700 fifty-five gallon drums containing toxic chemicals and forty-four truckloads of material containing asbestos. The EPA incurred costs of nearly $400,000 in responding to the environmental threat at SPW. On July 7, 1987, the facility was conveyed to Emanuel County, Georgia, at a foreclosure sale resulting from SPW's failure to pay state and county taxes.
 
 
 5
 The government sued Horowitz and Newton, the two principal officers and stockholders of SPW, and Fleet to recover the cost of cleaning up the hazardous waste. The district court granted the government's summary judgment motion with respect to the liability of Horowitz and Newton for the cost of removing the hazardous waste in the drums. The government's motion with respect to Fleet's liability, and the liability of Horowitz and Newton for the asbestos removal costs was denied. Fleet's motion for summary judgment was also denied. The district court, sua sponte, certified the summary judgment issues for interlocutory appeal and stayed the remaining proceedings in the case. Fleet subsequently brought this appeal challenging the court's denial of its motion for summary judgment.
 
 STANDARD OF REVIEW
 
 6
 The district court's disposition of the summary judgment motion is reviewable de novo because it involves legal questions of statutory interpretation. See Florida Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1315-16 (11th Cir.1990); Hiram Walker & Sons v. Kirk Line, Inc., 877 F.2d 1508, 1513 (11th Cir.1989); Clemens v. Dougherty County, Ga., 684 F.2d 1365, 1368 (11th Cir.1982). Under Fed.R.Civ.P. 56(c), summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Allis Chalmers, 893 F.2d at 1318. In evaluating a summary judgment motion, the burden of establishing the absence of a material dispute of fact is on the moving party; the court must view all evidence in the light most favorable to the non-movant and resolve all reasonable doubts about the facts in favor of the non-movant. Id.; WBS-TV v. Lee, 842 F.2d 1266, 1269 (11th Cir.1988); Warrior Tombigbee Transportation Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983); see Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 DISCUSSION
 
 7
 The Comprehensive Environmental Response Compensation and Liability Act was enacted by Congress in response to the environmental and public health hazards caused by the improper disposal of hazardous wastes. United States v. Maryland Bank & Trust Co., 632 F.Supp. 573, 576 (D.Md.1986); S.Rep. No. 848, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News 1980, p. 6119. The essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on "those responsible for problems caused by the disposal of chemical poison." Allis Chalmers, 893 F.2d at 1316; United States v. Aceto Agricultural Chemicals Corp., 872 F.2d 1373, 1377 (8th Cir.1989); Dedham Water Co. v. Cumberland Farms Dairy, 805 F.2d 1074, 1081 (1st Cir.1986). Accordingly, CERCLA authorizes the federal government to clean up hazardous waste dump sites and recover the cost of the effort from certain categories of responsible parties. Maryland Bank & Trust Co., 632 F.Supp. at 576.
 
 
 8
 The parties liable for costs incurred by the government in responding to an environmental hazard are: 1) the present owners and operators of a facility where hazardous wastes were released or are in danger of being released; 2) the owners or operators of a facility at the time the hazardous wastes were disposed; 3) the person or entity that arranged for the treatment or disposal of substances at the facility; and 4) the person or entity that transported the substances to the facility. Allis Chalmers, 893 F.2d at 1317; 42 U.S.C. Sec. 9607(a) (1982 & West Supp.1988). The government contends that Fleet is liable for the response costs associated with the waste at the SPW facility as either a present owner and operator of the facility, see 42 U.S.C. Sec. 9607(a)(1), or the owner or operator of the facility at the time the wastes were disposed, see 42 U.S.C. Sec. 9607(a)(2).
 
 
 9
 The district court, as a matter of law, rejected the government's claim that Fleet was a present owner of the facility. The court, however, found a sufficient issue of fact as to whether Fleet was an owner or operator of the SPW facility at the time the wastes were disposed to warrant the denial of Fleet's motion for summary judgment. On appeal each party contests that portion of the district court's order adverse to their respective interests.
 
 
 10
 A. Fleet's Liability Under Section 9607(a)(1)[2]
 
 
 11
 CERCLA holds the owner or operator of a facility containing hazardous waste strictly liable to the United States for expenses incurred in responding to the environmental and health hazards posed by the waste in that facility. See 42 U.S.C. Sec. 9607(a)(1); S.Rep. No. 848, 96th Cong., 2d Sess. 34 (1980). This provision of the statute targets those individuals presently "owning or operating such facilit[ies]." See 42 U.S.C. Sec. 9601(20)(A)(ii). In order to effectuate the goals of the statute, we will construe the present owner and operator of a facility as that individual or entity owning or operating the facility at the time the plaintiff initiated the lawsuit by filing a complaint.[3]
 
 
 12
 On July 9, 1987, the date this litigation commenced, the owner of the SPW facility was Emanuel County, Georgia. Under CERCLA, however, a state or local government that has involuntarily acquired title to a facility is generally not held liable as the owner or operator of the facility.[4] Rather, the statute provides that
 
 
 13
 in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, [its owner or operator is] any person who owned, operated or otherwise controlled activities at such facility immediately beforehand.
 
 
 14
 42 U.S.C. Sec. 9601(20)(A)(iii).
 
 
 15
 Essentially, the parties disagree as to the interpretation of the phrase "immediately beforehand." The district court reasoned that Fleet could not be liable under section 9607(a)(1) because it had never foreclosed on its security interest in the facility and its agents had not been on the premises since December 1983. The government contends that the statute should be interpreted to refer liability "back to the last time that someone controlled the facility, however long ago." Appellee's Brief at 23. Thus, according to the government, the period of effective abandonment of the site by the trustee in bankruptcy (from December 1983 to the July 1987 foreclosure sale) should be ignored and liability would remain with Fleet since it was the last entity to "control" the facility.
 
 
 16
 We agree with Fleet that the plain meaning of the phrase "immediately beforehand" means without intervening ownership, operation, and control. Fleet, therefore, cannot be held liable under section 9607(a)(1) because it neither owned, operated, or controlled SPW immediately prior to Emanuel County's acquisition of the facility. It is undisputed that from December 1981, when SPW was adjudicated a bankrupt, until the July 1987 foreclosure sale, the bankrupt estate and trustee were the owners of the facility. Similarly, the evidence is clear that neither Fleet nor any of its putative agents had anything to do with the facility after December 1983. Although Fleet may have operated or controlled SPW prior to December 1983, its involvement with SPW terminated more than three years before the county assumed ownership of the facility. The fact that the bankrupt estate or trustee may not have effectively exercised their control of the facility between December 1983 and July 1987 is of no moment. It is undisputed that Fleet was not in control of the facility during this period. Although a trustee can obviously abdicate its control over a bankrupt estate, it cannot in such a manner unilaterally delegate its responsibility to a previous controlling entity. To reach back to Fleet's involvement with the facility prior to December 1983 in order to impose liability would torture the plain statutory meaning of "immediately beforehand."[5]
 
 
 17
 B. Fleet's Liability Under Section 9607(a)(2)
 
 
 18
 CERCLA also imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any ... facility at which such hazardous substances were disposed of...." 42 U.S.C. Sec. 9607(a)(2). CERCLA excludes from the definition of "owner or operator" any "person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the ... facility." 42 U.S.C. Sec. 9601(20)(A). Fleet has the burden of establishing its entitlement to this exemption. Maryland Bank & Trust, 632 F.Supp. at 578; see United States v. First City National Bank of Houston, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967). There is no dispute that Fleet held an "indicia of ownership" in the facility through its deed of trust to SPW, and that this interest was held primarily to protect its security interest in the facility. The critical issue is whether Fleet participated in management sufficiently to incur liability under the statute.[6]
 
 
 19
 The construction of the secured creditor exemption is an issue of first impression in the federal appellate courts. The government urges us to adopt a narrow and strictly literal interpretation of the exemption that excludes from its protection any secured creditor that participates in any manner in the management of a facility. We decline the government's suggestion because it would largely eviscerate the exemption Congress intended to afford to secured creditors. Secured lenders frequently have some involvement in the financial affairs of their debtors in order to insure that their interests are being adequately protected. To adopt the government's interpretation of the secured creditor exemption could expose all such lenders to CERCLA liability for engaging in their normal course of business.
 
 
 20
 Fleet, in turn, suggests that we adopt the distinction delineated by some district courts between permissible participation in the financial management of the facility and impermissible participation in the day-to-day or operational management of a facility. In United States v. Mirabile, the first case to suggest this interpretation, the district court granted summary judgment to the defendant creditors because their participation in the affairs of the facility was "limited to participation in financial decisions." No. 84-2280, slip op. at 3 (E.D.Pa. Sept. 6, 1985) (available on WESTLAW as 1985 WL 97). The court explained "that the participation which is critical is participation in operational, production, or waste disposal activities. Mere financial ability to control waste disposal practices ... is not ... sufficient for the imposition of liability." Mirabile, No. 84-2280, slip op. at 4; accord United States v. New Castle County, 727 F.Supp. 854, 866 (D.Del.1989); Rockwell International v. IU International Corp., 702 F.Supp. 1384, 1390 (N.D.Ill.1988); see also Coastal Casting Service, No. H-86-4463, slip op. at 4(complaint alleging that secured creditor's entanglement with facility's management surpassed mere financial control held sufficient). The court concluded that "before a secured creditor ... may be held liable, it must, at a minimum, participate in the day-to-day operational aspects of the site. [Here, the creditor] ... merely foreclosed on the property after all operations had ceased and thereafter took prudent and routine steps to secure the property against further depreciation."[7] Id. at 12; accord United States v. Nicolet, Inc., 712 F.Supp. 1193, 1204-05 (E.D.Pa.1989).
 
 
 21
 The court below, relying on Mirabile, similarly interpreted the statutory language to permit secured creditors to
 
 
 22
 provide financial assistance and general, and even isolated instances of specific, management advice to its debtors without risking CERCLA liability if the secured creditor does not participate in the day-to-day management of the business or facility either before or after the business ceases operation.
 
 
 23
 Fleet Factors Corp., 724 F.Supp. at 960 (S.D.Ga.1988); accord Guidice, at 561-62;[8] Nicolet, 712 F.Supp. at 1205. Applying this standard, the trial judge concluded that from the inception of Fleet's relationship with SPW in 1976 to June 22, 1982, when Baldwin entered the facility, Fleet's activity did not rise to the level of participation in management sufficient to impose CERCLA liability. The court, however, determined that the facts alleged by the government with respect to Fleet's involvement after Baldwin entered the facility were sufficient to preclude the granting of summary judgment in favor of Fleet on this issue.
 
 
 24
 Although we agree with the district court's resolution of the summary judgment motion, we find its construction of the statutory exemption too permissive towards secured creditors who are involved with toxic waste facilities. In order to achieve the "overwhelmingly remedial" goal of the CERCLA statutory scheme,[9] ambiguous statutory terms should be construed to favor liability for the costs incurred by the government in responding to the hazards at such facilities. Allis Chalmers, 893 F.2d at 1317; see Maryland Bank & Trust Co., 632 F.Supp. at 579 (secured creditor exemption should be construed narrowly); Note, When a Security Becomes a Liability: Claims Against Lenders in Hazardous Waste Cleanup, 38 Hastings L.J. 1261, 1285-86, 1291 (1987) (same) [hereinafter Claims Against Lenders]. The district court's broad interpretation of the exemption would essentially require a secured creditor to be involved in the operations of a facility in order to incur liability. This construction ignores the plain language of the exemption and essentially renders it meaningless. Individuals and entities involved in the operations of a facility are already liable as operators under the express language of section 9607(a)(2). Had Congress intended to absolve secured creditors from ownership liability, it would have done so. Instead, the statutory language chosen by Congress explicitly holds secured creditors liable if they participate in the management of a facility.
 
 
 25
 Although similar, the phrase "participating in the management" and the term "operator" are not congruent. Under the standard we adopt today, a secured creditor may incur section 9607(a)(2) liability, without being an operator,[10] by participating in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous wastes. It is not necessary for the secured creditor actually to involve itself in the day-to-day operations of the facility in order to be liable--although such conduct will certainly lead to the loss of the protection of the statutory exemption. Nor is it necessary for the secured creditor to participate in management decisions relating to hazardous waste. Rather, a secured creditor will be liable if its involvement with the management of the facility is sufficiently broad to support the inference that it could affect hazardous waste disposal decisions if it so chose.[11] We, therefore, specifically reject the formulation of the secured creditor exemption suggested by the district court in Mirabile. See, No. 84-2280, slip op. at 4.
 
 
 26
 This construction of the secured creditor exemption, while less permissive than that of the trial court, is broader than that urged by the government and, therefore, should give lenders some latitude in their dealings with debtors without exposing themselves to potential liability. Nothing in our discussion should preclude a secured creditor from monitoring any aspect of a debtor's business. Likewise, a secured creditor can become involved in occasional and discrete financial decisions relating to the protection of its security interest without incurring liability.
 
 
 27
 Our interpretation of the exemption may be challenged as creating disincentives for lenders to extend financial assistance to businesses with potential hazardous waste problems and encouraging secured creditors to distance themselves from the management actions, particularly those related to hazardous wastes, of their debtors. See Guidice, 732 F.Supp. at 562; Note, Interpreting the Meaning of Lender Management Under Section 101(20)(A) of CERCLA, 98 Yale L.J. 925, 928, 944 (1989). As a result the improper treatment of hazardous wastes could be perpetuated rather than resolved. These concerns are unfounded.
 
 
 28
 Our ruling today should encourage potential creditors to investigate thoroughly the waste treatment systems and policies of potential debtors. If the treatment systems seem inadequate, the risk of CERCLA liability will be weighed into the terms of the loan agreement. Creditors, therefore, will incur no greater risk than they bargained for and debtors, aware that inadequate hazardous waste treatment will have a significant adverse impact on their loan terms, will have powerful incentives to improve their handling of hazardous wastes.
 
 
 29
 Similarly, creditors' awareness that they are potentially liable under CERCLA will encourage them to monitor the hazardous waste treatment systems and policies of their debtors and insist upon compliance with acceptable treatment standards as a prerequisite to continued and future financial support. Claims Against Lenders, supra, at 1294; Note, The Liability of Financial Institutions for Hazardous Waste Cleanup Costs Under CERCLA, 1988 Wis.L.Rev. 139, 185 (1988) [hereinafter Liability of Financial Institutions].[12] Once a secured creditor's involvement with a facility becomes sufficiently broad that it can anticipate losing its exemption from CERCLA liability, it will have a strong incentive to address hazardous waste problems at the facility rather than studiously avoiding the investigation and amelioration of the hazard.
 
 
 30
 In Maryland Bank & Trust Co., the court aptly described and weighed the competing policy interests of creditors and the government in interpreting the secured creditor exemption:
 
 
 31
 In essence, the defendant's position would convert CERCLA into an insurance scheme for financial institutions, protecting them against possible losses due to the security of loans with polluted properties. Mortgagees, however, already have the means to protect themselves, by making prudent loans. Financial institutions are in a position to investigate and discover potential problems in their secured properties. For many lending institutions, such research is routine. CERCLA will not absolve them from responsibility for their mistakes of judgment.
 
 
 32
 632 F.Supp. at 580 (citations omitted).
 
 
 33
 We agree with the court below that the government has alleged sufficient facts to hold Fleet liable under section 9607(a)(2). From 1976 until SPW ceased printing operations on February 27, 1981, Fleet's involvement with the facility was within the parameters of the secured creditor exemption to liability. During this period, Fleet regularly advanced funds to SPW against the assignment of SPW's accounts receivable, paid and arranged for security deposits for SPW's Georgia utility services, and informed SPW that it would not advance any more money when it determined that its advanced sums exceeded the value of SPW's accounts receivable.
 
 
 34
 Fleet's involvement with SPW, according to the government, increased substantially after SPW ceased printing operations at the Georgia plant on February 27, 1981, and began to wind down its affairs. Fleet required SPW to seek its approval before shipping its goods to customers, established the price for excess inventory, dictated when and to whom the finished goods should be shipped, determined when employees should be laid off, supervised the activity of the office administrator at the site, received and processed SPW's employment and tax forms, controlled access to the facility, and contracted with Baldwin to dispose of the fixtures and equipment at SPW. These facts, if proved, are sufficient to remove Fleet from the protection of the secured creditor exemption. Fleet's involvement in the financial management of the facility was pervasive, if not complete.[13] Furthermore, the government's allegations indicate that Fleet was also involved in the operational management of the facility. Either of these allegations is sufficient as a matter of law to impose CERCLA liability on a secured creditor. The district court's finding to the contrary is erroneous.
 
 
 35
 With respect to Fleet's involvement at the facility from the time it contracted with Baldwin in May 1982 until Nix left the facility in December 1983, we share the district court's conclusion that Fleet's alleged conduct brought it outside the statutory exemption for secured creditors.[14] Indeed, Fleet's involvement would pass the threshold for operator liability under section 9607(a)(2).[15] Fleet weakly contends that its activity at the facility from the time of the auction was within the secured creditor exemption because it was merely protecting its security interest in the facility and foreclosing its security interest in its equipment, inventory, and fixtures. This assertion, even if true, is immaterial to our analysis. The scope of the secured creditor exemption is not determined by whether the creditor's activity was taken to protect its security interest. What is relevant is the nature and extent of the creditor's involvement with the facility, not its motive. To hold otherwise would enable secured creditors to take indifferent and irresponsible actions toward their debtors' hazardous wastes with impunity by incanting that they were protecting their security interests. Congress did not intend CERCLA to sanction such abdication of responsibility.
 
 CONCLUSION
 
 36
 We agree with the district court that Fleet is not within the class of liable persons described in section 9607(a)(1). We also conclude that the court properly denied Fleet's motion for summary judgment. Although the court erred in construing the secured creditor exemption to insulate Fleet from CERCLA liability for its conduct prior to June 22, 1982, it correctly ruled that Fleet was liable under section 9607(a)(2) for its subsequent activities if the government could establish its allegations. Because there remain disputed issues of material fact, the case is remanded for further proceedings consistent with this opinion.
 
 
 37
 AFFIRMED and REMANDED.
 
 
 
 *
 Judge Robert S. Vance was a member of the panel which heard oral argument but due to his death on December 16, 1989, did not participate in this decision. This case is decided by a quorum. See 28 U.S.C. Sec. 46(d)
 
 
 **
 Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 This court has jurisdiction of this appeal pursuant to 28 U.S.C. Sec. 1292(b)
 
 
 [2]
 As an initial matter, we must consider whether this issue is properly before us on appeal. Fleet notes that the district court held that it was not liable as the present "owner or operator" of the facility and argues that its appeal did not challenge this aspect of the court's order. Rather, it only sought to appeal that part of the district court's order denying its motion for summary judgment. Fleet argues that a party is precluded from seeking reversal of an order, on an interlocutory appeal, if it did not properly petition for permission to appeal
 Fleet's position is meritless. When a district court certifies an order for appeal, all questions material to that particular order are properly before the court of appeals. See United States v. Stanley, 483 U.S. 669, 676-77, 107 S.Ct. 3054, 3060, 97 L.Ed.2d 550 (1987) (construing Sec. 1292(b) interlocutory appeals to bring entire lower court order before appellate court, not just precise question certified).
 Here, the district court's order clearly certifies this issue for interlocutory appeal. Even if construed otherwise, the district court expressly refused to limit its certification order to a specific issue. The district court's order states:
 I find that this order disposes of controlling questions of law concerning which there is substantial doubt, including, but not limited to, my construction of CERCLA's definition of "owner and operator" and the secured lender exemption contained in that definition: my construction of the CERCLA provisions describing the classes of liable persons; and my construction of the scope of the third-party defense to CERCLA liability.
 United States v. Fleet Factors Corp., 724 F.Supp. 955, 962 (S.D.Ga.1988) (emphasis added).
 
 
 [3]
 Although the "owner and operator" language of Sec. 9607(a)(1) is in the conjunctive, we construe this language in the disjunctive in accordance with the legislative history of CERCLA and the persuasive interpretations of other federal courts. See Maryland Bank & Trust Co., 632 F.Supp. at 577-78; see also Guidice v. BFG Electroplating and Manufacturing Co., 732 F.Supp. 556, 561 (W.D.Pa.1989) (interpreting statute in disjunctive); Artesian Water Co. v. Government of New Castle County, 659 F.Supp. 1269, 1280 (D.Del.1987) (same), affirmed, 851 F.2d 643 (3d Cir.1988). Additionally, we note that Sec. 9607(a)(2) is phrased in the disjunctive. We can perceive no rational explanation, other than careless statutory drafting, for imposing liability upon "owners or operators" under one section but only holding "owners and operators" liable under another section. Cf. Coastal Casting Service v. Aron, No. H-86-4463 slip op. at 3, 1988 WL 35012 (S.D.Tex. April 8, 1988) ("It is well known that CERCLA was hastily drafted and adopted, with resulting ambiguities. ...") (available on WESTLAW as 1988 WL 35012); Maryland Bank & Trust Co., 632 F.Supp. at 578 ("The structure of section 107(a) [9607(a) ], like so much of this hastily patched together compromise Act, is not a model of statutory clarity."). Our construction of both statutory provisions in the disjunctive is further supported by the fact that the definitional section of the statute only refers to the phrase "owner or operator." See 42 U.S.C. Sec. 9601(20)(A)
 
 
 [4]
 CERCLA does provide that a state or local government will be liable under these circumstances when it "has caused or contributed to the release or threatened release of a hazardous substance from the facility...." 42 U.S.C. Sec. 9601(20)(D). This exception, however, is not applicable here
 
 
 [5]
 This interpretation of Sec. 9607(a)(1) is particularly appropriate in the context of the entire statutory scheme. While Sec. 9607(a)(1) targets present owners and operators of toxic waste facilities, Sec. 9607(a)(2) focuses on the entities that owned or operated the facility at the time the wastes were disposed. A narrow reading of this section would not, therefore, create an unintended loophole for individuals or entities to escape liability for improperly disposing hazardous waste
 
 
 [6]
 The government correctly formulates this issue as being comprised of two distinct, but related, means of finding Fleet liable under Sec. 9607(a)(2). First, Fleet is liable under the statute if it operated the facility within the meaning of the statute. Alternatively, Fleet can be held liable if it had an indicia of ownership in SPW and managed the facility to the extent necessary to remove it from the secured creditor liability exemption. See United States v. Kayser-Roth Corp., 724 F.Supp. 15, 20-21 (D.R.I.1989). Although we can conceive of some instances where the facts showing participation in management are different from those indicating operation, this is not such a case. The sum of the facts alleged by the government is sufficient to hold Fleet liable under either analysis. In order to avoid repetition, and because this case fits more snugly under a secured creditor analysis, we will forgo an analysis of Fleet's liability as an operator
 
 
 [7]
 The court permitted a secured creditor to secure a facility against vandalism by boarding up windows and changing locks, make inquiries as to the cost of disposing various drums of toxins, visit the property in order to show it to prospective purchasers, monitor its cash collateral accounts, ensure that receivables went to the proper accounts, and establish a reporting system between the facility and the bank. Mirabile, No. 84-2280, slip op. at 5, 8. The court suggested that activities which might bring a secured creditor outside the protection of the exemption included determining the order in which orders were filled, demanding additional sales from the facility, supervising the operations of the facility, and insisting on certain manufacturing changes and reassignment of personnel. Id. at 8
 
 
 [8]
 In Guidice, the district court applied this analysis to exempt a bank from CERCLA liability because the bank's activities with respect to the facility were directed at protecting its security interest rather than controlling the facility's operational, production, or waste disposal activities. 732 F.Supp. at 561-62. The bank's involvement with the facility included meetings where it was informed of the status of the facility's accounts, personnel changes, and the presence of raw materials; assistance in procuring a loan from another lender; communicating with local officials to assist the facility with wastewater discharge compliance; inspecting the property after it ceased operations; efforts to restructure the facility's loans; and an agreement to provide financing if a particular party purchased the facility at a foreclosure sale. Id. at 562
 
 
 [9]
 Allis Chalmers, 893 F.2d at 1317; United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 733 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)
 
 
 [10]
 For an example of activity that could subject a secured creditor to liability as an operator, see Kayser-Roth Corp., 724 F.Supp. at 22-23
 
 
 [11]
 This narrow construction of the secured creditor exemption is supported by the sparse legislative history on the subject. The Senate version of CERCLA initially lacked an exemption for secured creditors in its definition of "owner or operator." See S. 1480, 97th Cong., 2d Sess., reprinted in 2 Senate Comm. on Environmental and Public Works, 97th Cong., 2 Sess., 1 A Legislative History of the CERCLA 470 (Comm. Print 1983). Representative Harsha introduced the exemption to the bill that was finally passed stating:
 This change is necessary because the original definition inadvertently subjected those who hold title to a ... facility, but do not participate in the management or operation and are not otherwise affiliated with the person leasing or operating the ... facility, to the liability provisions of the bill.
 Remarks of Rep. Harsha, reprinted in 2 Senate Comm. on Environmental and Public Works, 97th Cong., 2d Sess., 2 A Legislative History of the CERCLA 945 (Comm. Print 1983) (emphasis added). The use of the word "affiliated" to describe the threshold at which a secured creditor becomes liable clearly indicates a more peripheral degree of involvement with the affairs of a facility than that necessary to be held liable as an operator. It also suggests that the interpretation of the exemption intended by Congress is more consistent with the level of secured creditor involvement described in our opinion than with the management of day-to-day operations standard set forth in Mirabile.
 
 
 [12]
 One commentator notes that a narrow construction of the secured creditor exemption
 conforms with CERCLA's implicit function of encouraging safer hazardous waste procedures. The possibility that CERCLA liability will depress the value of the security property provides economic incentive for lenders to guard against its misuse. Lending institutions are especially well-equipped for this function. They can require the borrower to submit to periodic environmental audits, either as a condition to receiving a loan or by an amendment to an existing agreement. Lenders can also require warranties from their borrowers guaranteeing that they are in full compliance with hazardous waste laws and regulations.... Ultimately, lenders can refuse to lend money to persons believed to be operating illegal or improper hazardous waste activities. While there is a clear risk that innocent borrowers will find it difficult to obtain credit because of the nature of their business, this result is consistent with CERCLA's general effect of spreading hazardous waste costs industry-wide.
 Claims Against Lenders, supra, at 1294 (citations omitted); see also Liability of Financial Institutions, supra, at 183-85 (discussing lender strategies for decreasing liability risk under a narrow interpretation of the secured creditor exemption).
 
 
 [13]
 Generally, the lender's capacity to influence a debtor facility's treatment of hazardous waste will be inferred from the extent of its involvement in the facility's financial management. Here, that inference is not even necessary because there was evidence before the district court that Fleet actively asserted its control over the disposal of hazardous wastes at the site by prohibiting SPW from selling several barrels of chemicals to potential buyers. As a result, the barrels remained at the facility unattended until the EPA acted to remove the contaminants
 
 
 [14]
 The district court summarized the government's allegations of Fleet's conduct at the facility during this period as follows:
 Plaintiff alleges that Baldwin moved the barrels that allegedly contained hazardous substances before Baldwin conducted the public auction. Plaintiff contends that after the auction, Baldwin auctioned some, but not all, of the machinery and equipment as is, and in place, and permitted the purchasers to remove the equipment and machinery that they had purchased. Plaintiff asserts that after the auction Fleet signed a document that permitted Nix to have access to the facility for 180 days and to remove any remaining machinery and equipment.... Plaintiff maintains that friable asbestos was knocked loose from the pipes connected to the machinery and equipment by either the purchasers of the equipment at the auction or Nix. Plaintiff alleges that the condition of the chemicals and the asbestos in the facility after Baldwin, Nix, and the purchasers concluded their business constituted an immediate risk to public health and the environment....
 Fleet Factors, 724 F.Supp. at 960-61. Fleet disputes these material facts. Id. at 961.
 
 
 [15]
 During oral argument, counsel for Fleet virtually conceded operator liability for its conduct with respect to the facility when he discussed Fleet's potential for liability were it to have fixed a hole in the roof of an SPW building:
 JUDGE KRAVITCH: If [Fleet] finds in fixing the roof that there is some asbestos that is being dislodged can it just ignore that?
 ....
 MR. GOOD: Once it fixes the roof, once it takes over control of fixing the roof, it has opened a potential pandora's box both as to that asbestos and anything else at that facility underneath it known and unknown.
 JUDGE KRAVITCH: Why isn't that analogous to what happened here?