910 F.2d 668
 31 ERC 1785, 59 USLW 2145, 20 Envtl.
L. Rep. 21,229
 In re BERGSOE METAL CORPORATION, a Delaware corporation, SSN
I.D. No. 93-0174023, Debtor,
David A. HILL, trustee for Bergsoe Metal Corporation and;
United States National Bank of Oregon, a national
banking association, Plaintiffs,
v.
The EAST ASIATIC COMPANY, LTD.; The East Asiatic Company,
Inc.; Heidelberg Eastern, Inc.,
Defendants-Counterclaimants/Appellants,
v.
PORT OF ST. HELENS, Counterdefendant/Appellee.
 No. 89-35397.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 7, 1990.
Decided Aug. 9, 1990.
 
 Elizabeth A. Conklyn, Bogle & Gates, Seattle, Wash., for defendants-counterclaimants/appellants.
 Jeffrey M. Batchelor, Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or., for counterdefendant/appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before BROWNING, ALARCON and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Secs. 9601 et seq. (CERCLA), provides that the "owner" of a contaminated facility is liable for the costs of cleanup. It is left for the courts, however, to clean up the mess left behind by complicated financial transactions. We search for the CERCLA owner.
 
 Facts
 
 2
 Bergsoe Metals is a Delaware corporation formed in 1978 for the purpose of conducting a lead recycling operation. The East Asiatic Company, Ltd., The East Asiatic Company, Inc. and Heidelberg Eastern, Inc. (collectively, EAC) are owners of Bergsoe's stock. The Port of St. Helens is a municipal corporation organized under the laws of Oregon and empowered to issue revenue bonds to promote industrial development in the St. Helens, Oregon area.
 
 
 3
 Sometime in 1978, representatives of Bergsoe contacted the Port to discuss the building of a lead recycling facility in St. Helens. These discussions resulted in a Memorandum of Agreement signed December 13, 1978. The Port therein agreed to issue industrial development revenue bonds and pollution control revenue bonds to provide funds for the acquisition of land and the construction of a secondary lead recycling plant and related pollution control equipment in St. Helens.
 
 
 4
 On December 28, 1979, the Port sold Bergsoe 50 acres of land on which to construct the plant. In exchange, Bergsoe gave the Port a promissory note for $400,000 and a mortgage on the property.
 
 
 5
 Through a series of interlocking transactions that closed on June 5, 1981, Bergsoe, the Port and the United States National Bank of Oregon completed the financing for the recycling operation. At the heart of this financing were the revenue bonds, issued by the Port. The Bank held the bonds in trust for the bondholders. The revenue from the bond sales went to Bergsoe, which was obligated to pay the money owed on the bonds to the Bank.
 
 
 6
 The first transaction was a sale-and-lease-back arrangement between Bergsoe and the Port. Bergsoe conveyed to the Port by warranty deed the 50 acres and the recycling plant to be built there. The Port and Bergsoe then entered into two leases to cover the property and the plant. Bergsoe agreed to construct the plant and to pay rent on the leases directly to the Bank. That rent was equal to the principal and interest to come due on the bonds. The leases gave Bergsoe the option of purchasing the entire facility for $100 once the bonds had been paid in full.
 
 
 7
 The second transaction involved two mortgage and indentures of trust between the Port and the Bank, corresponding to the two leases. The Port agreed to issue its revenue bonds, and mortgaged to the Bank, as trustee for the bondholders, the property and recycling plant. The Port also assigned to the Bank all its rights under, and revenues to be generated from, the leases. The Bank agreed to hold the amounts generated from sale of the bonds in a construction fund to be paid to Bergsoe. The indentures obligated the Bank to collect rent under the leases and to apply them in retirement of the bonds.
 
 
 8
 In addition to acting as trustee, the Bank purchased the bonds. In partial consideration for this purchase, the Port signed a subordination agreement whereby the Port subordinated all its rights under the prior $400,000 obligation to the Bank's rights under the leases.
 
 
 9
 The Port also placed in escrow with the Bank the warranty deeds, bills of sale and UCC release statements, with instructions to deliver the documents to Bergsoe when the company exercised its option to purchase the facility.
 
 
 10
 The Bergsoe recycling plant began operation in the spring of 1982 and soon experienced financial difficulties. In September 1983, the Bank declared Bergsoe in default on the leases. Subsequently, the Bank and Bergsoe agreed upon a workout arrangement, whereby Front Street Management Corporation would manage the recycling facility. In exchange, the Bank and the Port would agree not to foreclose under the leases or bond indentures. On June 30, 1984, the Bank, Bergsoe, Front Street and the Port executed various workout documents.
 
 
 11
 The plant did no better under Front Street's management than it had under Bergsoe's, and the plant shut down in 1986. On October 21 of that year, the Bank put Bergsoe into involuntary bankruptcy under Chapter 11 of the Bankruptcy Code. By that time, the Oregon Department of Environmental Quality had determined that various hazardous substances had contaminated the plant site. In September 1987, the Bank and the trustee in bankruptcy filed suit against EAC, the companies who own Bergsoe, to collect on Bergsoe's debts. The plaintiffs subsequently amended their complaint to request a declaration that EAC is liable for the costs of cleaning up the environmental contamination.
 
 
 12
 The defendants filed a counterclaim, including a third party complaint against the Port, alleging that the Bank and the Port are liable for the costs of cleanup under CERCLA. The Port moved for summary judgment, alleging that it does not own the recycling plant for CERCLA purposes, and therefore has no CERCLA liability. The bankruptcy court granted the motion, which the district court affirmed. EAC appeals the grant of summary judgment in favor of the Port.
 
 Discussion
 
 13
 CERCLA holds the "owner" of a facility liable for the costs of cleaning up hazardous substances released at the facility. 42 U.S.C. Secs. 9607(a)(1) & (2).[1] The CERCLA definition of "owner" is not, however, coextensive with all possible uses of that term; it specifically excludes "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. Sec. 9601(20)(A). CERCLA thus protects secured creditors who do not participate in management of the facility. See United States v. Fleet Factors Corp., 901 F.2d 1550, 1554 (11th Cir.1990).
 
 
 14
 There is no question that, in at least one sense, the Port owns the Bergsoe recycling plant: the deed to the property is in the name of the Port. The Port nonetheless maintains that it is not a CERCLA owner because it falls within the security interest exception.
 
 
 15
 In order for the Port to win on summary judgment, the undisputed facts must demonstrate both that the Port holds indicia of ownership primarily to protect its security interest in the Bergsoe plant and that it did not participate in the management of the plant. If, after viewing the evidence most favorably to EAC, there is a material issue as to either of these points, summary judgment is inappropriate. See Karamanos v. Egger, 882 F.2d 447, 449 (9th Cir.1989).
 
 I. Security Interest
 
 16
 That the Port holds paper title to the Bergsoe plant does not, alone, make it an owner of the facility for purposes of CERCLA; under the security interest exception the court must determine why the Port holds such indicia of ownership. Here, there is no doubt that the Port has the deed in the plant primarily to ensure that Bergsoe would meet its obligations under the leases and therefore under the bonds. In other words, the Port has a security interest in the property.
 
 
 17
 The Port is in somewhat of a different position than the ordinary secured creditor, who holds indicia of ownership to ensure that it will be paid what it is owed. Here, the Port held title to the property not to ensure that it would receive payment, but to guarantee that Bergsoe would cover the Port's own indebtedness under the bonds. This does not change the analysis. Indeed, it demonstrates just how divorced from the Bergsoe operation the Port was. Essentially, the Bank financed the Bergsoe plant; the Port's only involvement was to give its approval to the project and to issue the bonds that served as the vehicle for the financing. The Port received the warranty deeds as part of a transaction whose sole purpose was to provide financing for the plant.
 
 
 18
 The relevant evidence that the Port's ownership was merely part of the financing arrangement is to be found in the Port/Bergsoe leases. These documents do grant to the Port the deeds to the property, and each document is described as a "lease" rather than as a "security agreement." Nonetheless, the leases give to Bergsoe all other traditional indicia of ownership, such as responsibility for the payment of taxes and for the purchase of insurance; significantly, the leases assign to Bergsoe the risk of loss from destruction or damage to the property.
 
 
 19
 Even more telling, however, are the terms of repayment under the leases. Bergsoe's "rent" was equal to the principal and interest due under the bonds. The money was to be paid directly to the Bank as trustee for the bondholders. The leases expired not on a specific date, but when the money owed under the bonds was paid off. And, when the bonds were paid off, Bergsoe could purchase full title to the property for the nominal sum of $100. To facilitate this transaction, the Port had placed the deeds and other relevant documents in escrow with the Bank.
 
 
 20
 EAC points to nothing other than the leases to demonstrate that the Port's indicia of ownership are not primarily to protect a security interest. The leases create no material issue of fact on this question.
 
 II. Participation in Management
 
 21
 The Port may nonetheless be liable under CERCLA if it participated in the management of the Bergsoe plant. Unfortunately, CERCLA does not define the phrase "participating in the management ... of a facility." The statute thus provides little guidance as to how much control over a facility a secured creditor can exert before it will be liable for cleanup.
 
 
 22
 To date, only one federal circuit has addressed this question. In Fleet Factors, the Eleventh Circuit considered several alternative rules. The government proposed that a secured creditor that participates in any manner in the management of a facility is excluded from the security interest exemption. Id, 901 F.2d at 1554. Fleet Factors proposed a rule adopted by certain district courts, that participation in financial management is allowable, but participation in the day-to-day or operational management of a facility will subject the creditor to liability. Id. The Eleventh Circuit adopted an intermediate rule:
 
 
 23
 [A] secured creditor may incur section 9607(a)(2) liability ... by participating in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous wastes. It is not necessary for the secured creditor actually to involve itself in the day-to-day operations of the facility in order to be liable--although such conduct will certainly lead to the loss of the protection of the statutory exemption. Nor is it necessary for the secured creditor to participate in management decisions related to hazardous waste. Rather, a secured creditor will be liable if its involvement with the management of the facility is sufficiently broad to support the inference that it could affect hazardous waste disposal decisions if it so chose.
 
 
 24
 Id, at 1557-58.
 
 
 25
 We leave for another day the establishment of a Ninth Circuit rule on this difficult issue. It is clear from the statute that, whatever the precise parameters of "participation," there must be some actual management of the facility before a secured creditor will fall outside the exception. Here there was none, and we therefore need not engage in line drawing.
 
 
 26
 EAC points to several facts that it claims demonstrate that the Port participated in the management of the Bergsoe plant. First, that the Port "negotiated and encouraged" the building of the Bergsoe plant. Brief of Appellant at 19. Were this sufficient to remove a creditor from the security interest exception, the exception would cease to have any meaning. Creditors do not give their money blindly, particularly the large sums of money needed to build industrial facilities. Lenders normally extend credit only after gathering a great deal of information about the proposed project, and only when they have some degree of confidence that the project will be successful. A secured creditor will always have some input at the planning stages of any large-scale project and, by the extension of financing, will perforce encourage those projects it feels will be successful. If this were "management," no secured creditor would ever be protected.[2]
 
 
 27
 EAC next points to certain of the Port's rights under the leases, such as the right to inspect the premises and to reenter and take possession upon foreclosure. This argument suffers from the same flaw as the last; nearly all secured creditors have these rights. That a secured creditor reserves certain rights to protect its investment does not put it in a position of management. What is critical is not what rights the Port had, but what it did. The CERCLA security interest exception uses the active "participating in management." Regardless of what rights the Port may have had, it cannot have participated in management if it never exercised them.[3] And there is no evidence that the Port exercised any control over Bergsoe once the two parties signed the leases.
 
 
 28
 Finally, EAC argues that the Port participated in management through its actions in giving Front Street control at the plant as part of the 1984 workout. There is, however, no evidence that the Port participated in the decision to hire Front Street; those negotiations were entirely between the Bank, Bergsoe and Front Street. The Port's participation was limited to an agreement between itself, the Bank and Bergsoe. The Port's sole obligation under the agreement was to forego exercising any of its default remedies under the leases so that the workout might proceed. There were separate agreements between Bergsoe and Front Street and between the Bank and Bergsoe. The Port never entered into a contract with Front Street, and there is no evidence of any negotiations between the two.
 
 
 29
 EAC contends, nonetheless, that the Port is responsible for the Bank's actions in placing Front Street in control because the Bank was acting as the Port's agent, enforcing the Port's rights under the leases. This assertion is belied by the terms of the mortgage and indentures of trust between the Port and the Bank, wherein the Port assigns to the Bank "all right, title and interest of the [Port] in the Lease[s]." ER I at 107. Thus, to the extent the Bank was attempting to enforce the lease terms, it did so pursuant to its own rights under the leases. More to the point, it was not the leases that the Bank was worried about, but the bonds. As trustee for the bondholders, the Bank had a duty to try to keep the plant running so that Bergsoe could pay the principal and interest under the bonds. In negotiating the workout, the Bank was acting not as the Port's agent, but as the bondholders'.
 
 Conclusion
 
 30
 There being no material issue of fact, we conclude that the Port holds indicia of ownership primarily to protect its security interest and that it did not participate in the management of the Bergsoe recycling plant. The Port is therefore not an owner under 42 U.S.C. Sec. 9601(20)(A), and not liable for cleanup costs under 42 U.S.C. Sec. 9607. The judgment of the district court is affirmed.
 
 
 
 [1]
 CERCLA also holds liable for cleanup parties other than the owner of a facility. See 42 U.S.C. Sec. 9607(a). EAC does not contend, however, that the Port would be liable under any of these other provisions
 
 
 [2]
 No doubt the Port, as a municipal corporation empowered to promote industrial development, encouraged Bergsoe to build the plant for reasons other than the Port's own financial gain. A creditor's motivation is irrelevant, however, to the issue of whether its actions constitute management
 
 
 [3]
 EAC also contends that the Port had the right "to direct that hazardous waste be stored properly." Brief of Appellant at 20. We find nothing in the leases granting the Port such a right. In any event, there is no evidence that the Port ever exercised this right
 EAC generally errs in equating the power to manage with actual management. As did the Eleventh Circuit in Fleet Factors, we hold that a creditor must, as a threshold matter, exercise actual management authority before it can be held liable for action or inaction which results in the discharge of hazardous wastes. Merely having the power to get involved in management, but failing to exercise it, is not enough.