**UNITED STATES of America, Plaintiff,**

v.

**FLEET FACTORS CORPORATION, Clifford Horowitz, and Murray Newton, Defendants.**

**FLEET FACTORS CORPORATION, Third–Party Plaintiff,**

v.

**Robert KOLODNEY, as Trustee Bankruptcy of Swainsboro Print Works, Inc., Third–Party Defendant.**

Civ. A. No. CV687–070.

United States District Court, S.D. Georgia, Statesboro Division.

April 23, 1993.

---

Edmund Alexander Booth, Jr., Kenneth C. Etheridge, Augusta, GA, Wilda Cobb, U.S. E.P.A., Atlanta, GA, Donald A. Carr, Anne S. Almy, U.S. Dept. of Justice, Land and Natural Resources Div., Jon A. Mueller, John C. Cruden, U.S. Dept. of Justice, Environmental Enforcement Sect., Bradley Campbell, U.S. Dept. of Justice, Environmental & Natural Resource, Policy, Legislation & Special Litigation, Myles E. Flynt, Acting Asst. Atty. Gen., Env. & Natural Resources, Washington, DC, for U.S.

Mary Jane Norville, Patricia Thrower Barmeyer, King & Spalding, Atlanta, GA, Richard Edwin Miley, Richard E. Miley, Attorney at Law, P.A., North Augusta, SC, for defendant Fleet Factors Corp.

Charles B. Merrill, Jr., Merrill, Stone & Parks, Swainsboro, GA, for defendant Clifford Horowitz.

Murray Newton, pro se.

Cecil A. Citron, Sherman, Citron & Karasik, New York City, for third-party defendant Robert Kolodney.

### ORDER

BOWEN, District Judge.

Before the Court are the second Cross–Motions for Summary Judgment filed by the United States of America ("Government") and Fleet Factors Corporation ("Fleet"). The Government's Summary Judgment Motion alleges that Fleet is liable under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675, ("CERCLA") as the operator of a CERCLA facility and as a "person" that "arranged for disposal" of hazardous substances. Fleet's Motion for Summary Judgment is based on CERCLA's exemption of qualified secured creditors from operator liability. Fleet denies that CERCLA's "arranged for disposal" liability provision applies here. For the reasons stated below and as explained at the hearing on the parties' Motions for Summary Judgment, genuine issues of material fact exist and require denial of both motions.

## I. BACKGROUND

The Government brought this action against Fleet to recover the cost of conducting an environmental response action at the Swainsboro Print Works ("SPW"), a textile printing plant in Swainsboro, Georgia. Clifford Horowitz served as SPW's president and Murray Newton served as vice-president; the two were SPW's sole stockholders. In 1976, Fleet entered into a standard factoring agreement with SPW.[1] Pursuant to that agreement, Fleet advanced funds against SPW's accounts receivable and took a security interest in SPW's real property, inventory, equipment, and machinery as collateral. Also, as part of its role as factor, Fleet frequently was in contact with SPW.

In August of 1979, SPW filed for debtor relief under Chapter 11 of the United States Bankruptcy Act and continued operations as

---

1. Fleet formerly operated under the name Ambassador Factors Corporation.

a debtor in possession. With court approval, Fleet continued to advance funds to SPW. When SPW's debt to Fleet exceeded the value of its accounts receivable, Fleet discontinued advancing funds, and, on February 27, 1981, SPW ceased operations. After operations ceased, however, salable inventory, equipment, and chemicals remained at the SPW plant site. At that point, a skeleton crew was retained to pack and ship the remaining inventory and to provide site security. Fleet advanced funds during this winding-down period to pay utilities and to make payroll. On May 13, 1982, the United States Bankruptcy Court for the Southern District of New York entered a Stipulation and Order authorizing Fleet to foreclose on the SPW inventory, equipment, and machinery.

Following entry of the Stipulation and Order, Fleet arranged with Baldwin Industrial Liquidators, Inc., ("Baldwin") to conduct a public auction of the SPW equipment and machinery for the benefit of Fleet. As part of its auction preparations, Baldwin organized the salable items and arranged the site. The items were sold "as is, where is" on June 22, 1982. After the auction, Fleet contracted with Nix Rigging Company ("Nix") to remove any equipment or machinery that was not sold or not picked up by the purchasers. Nix removed some but not all of the remaining SPW equipment and machinery.

The Environmental Protection Agency ("EPA") evaluated the SPW site in January 1984 at the behest of the Georgia Environmental Protection Division. That inspection revealed several hundred drums and numerous vats of CERCLA hazardous chemicals plus what the Government alleges to be asbestos.[2] Responding to its findings, EPA conducted a CERCLA removal action and incurred the costs upon which this suit is based.

In *United States v. Fleet Factors Corp.,* 724 F.Supp. 955 (S.D.Ga.1988), this Court denied the Government's and Fleet's Cross-Motions for Summary Judgment. Fleet appealed. The Eleventh Circuit Court of Appeals affirmed the denial of Fleet's Motion for Summary Judgment and remanded this case for trial. *See United States v. Fleet*

*Factors Corp.,* 901 F.2d 1550 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). In doing so, the Eleventh Circuit explained a standard for secured creditor liability that stirred the financial community. EPA responded by promulgating a proposed rule interpreting the CERCLA secured creditor liability exemption included in 42 U.S.C. § 9601(20)(A). I stayed this action to await the final rule. Soon after the final rule's April 29, 1992, effective date, *see* 57 Fed.Reg. 18344–85 (1992), I re-activated this action, and both parties filed a second round of cross-motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *quoting* Fed.R.Civ.P. 56 Advisory Committee Note. There is no legitimate need for trial when the movant shows that under the evidence no reasonable jury could find in favor of the opposing party or that only a question of law is involved. *See* Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2712 (1983). Courts often rephrase this standard by stating that a motion for summary judgment may be granted only when there is no "genuine issue of material fact." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (summary judgment warranted when no issue as to any material fact). Significantly, a dispute over a material fact is "genuine" only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Id.*

A court reviewing a summary judgment motion *always* must first consider whether the movant has met its initial burden of affirmatively showing either that no reasonable jury could find for the opposing party or that only a question of law is involved. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

---

**2.** Fleet maintains EPA inadequately tested the    suspected asbestos.

106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion"); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991) (discussing at length proper application of *Celotex* ). When the moving party seeks to establish that no genuine issue of material fact exists, the reviewing court must view all evidence in the light most favorable to the opposing party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Generally, when a moving party seeks to establish that no genuine issue of material fact exists, its initial burden is satisfied only if it refers to specific materials on file to negate a critical element of the non-movant's claim. *Clark,* 929 F.2d at 608. In *Celotex,* however, the Court created an exception applicable when the burden of proof at trial will fall on the non-movant. *Clark,* 929 F.2d at 608. Under this exception, the movant may meet its initial burden "without negating an element of the non-moving party's claim...." *Clark,* 929 F.2d at 608. Instead, the movant may point "... to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.*[3] Because the *Celotex* exception affects only the requirement that an element of the non-movant's claim be negated; however, the movant still must support its motion by identifying specific documents on file. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."[4] *Id.*

Once it is determined that the movant's initial burden is met, the non-moving party must then show that a genuine issue of fact exists. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 585–586, 585 n. 10, 106 S.Ct. at 1355–56, 1356 n. 10 (because movant's initial summary judgment burden met, non-movant required to establish the existence of a material issue of fact); *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992). To do so, the non-moving party must do more than rely on the pleadings or merely repeat the conclusory allegations of the complaint. *Morris v. Ross,* 663 F.2d 1032, 1033 (11th Cir.1981), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). The non-movant "must present affirmative evidence," *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2515; in other words, the non-movant "must set forth specific facts showing that there is a genuine need for trial," *Johns v. Jarrard,* 927 F.2d 551, 555 (11th Cir.1991) (citation omitted).

The clerk has given the parties notice of the summary judgment motions, the right to file affidavits or other materials in opposition, and of the consequences of default. Thus, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied.

### III. ANALYSIS

CERCLA is a comprehensive remedial plan enacted in 1980 that addresses the nation's hazardous substance environmental problems.[5] In the years since 1980, courts have struggled with its language and often have stated that its essential purpose is "to force those responsible for creating hazardous waste problems to bear the cost of their actions." *United States v. Bliss,* 667 F.Supp. 1298, 1304 (E.D.Mo.1987) (citing *Violet v. Picillo,* 648 F.Supp. 1283, 1286 (D.R.I.1986)). This characterization, however, fails to convey accurately the far-reaching scope of the act as interpreted by the courts. Citing legislative history, courts applying CERCLA

---

3. *See, e.g. Celotex,* 477 U.S. at 320, 106 S.Ct. at 2551 (movant met its burden by noting non-movant "had failed to identify, in answering interrogatories specifically requesting such information, any witness who could testify about the decedent's exposure to [movant's] asbestos products").

4. For a thorough discussion of the movant's initial burden, see James V. Chin, Note, *Clark v. Coats & Clark, Inc.: The Eleventh Circuit Clari-* fies the Initial Burden in a Motion for Summary Judgment, 26 Ga.L.Rev. 1009 (1992).

5. *See* H.R.Rep. No. 1016, 96th Cong., 2d Sess. pt. 1, at 17–22 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6119–25. Congress amended this act in 1986. *See* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, § 1, 100 Stat. 1613 (1986).

have found the statute's goal to be "overwhelmingly remedial" and, on that basis, interpreted its provisions liberally in favor of liability.[6] *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir.1992); *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1557 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991) (citing *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990), and *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 733 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)).

The focal point of any discussion concerning CERCLA's extensive scope is 42 U.S.C. § 9607, the act's liability provision. In § 9607, the "covered persons" who may be held liable under CERCLA are listed in four categories:

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances where disposed of,

(3) any person who ... arranged for disposal or treatment [of hazardous substances] ..., and

(4) any person who accepts or accepted hazardous substances for transport to disposal or treatment facilities....

42 U.S.C. § 9607(a). These four categories in turn must be interpreted by applying the definitions found in 42 U.S.C. § 9601. Most relevant here is that § 9601(20)(A) excludes from its definition of the term "owner or operator" [7] any person "who, *without participating in the management* of a vessel or

facility, holds indicia of ownership primarily to protect its security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A) ("Secured Creditor Exemption") (emphasis supplied).

Here, § 9607(a)(2), § 9607(a)(3), and the Secured Creditor Exemption are in issue. In its Motion for Summary Judgment, the Government asserts that Fleet is liable under § 9607(a)(2) as an owner or operator at the time of hazardous substance disposal and under § 9607(a)(3) as a person who arranged for disposal. Fleet bases its Motion for Summary Judgment on the Secured Creditor Exemption, although the Government denies that the exemption applies.

### A. Section 9607(a)(2) and the Secured Creditor Exemption

In *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991) ("*Fleet Factors II*"), the Eleventh Circuit Court of Appeals affirmed the denial of Fleet's first Motion for Summary Judgment.[8] In doing so, the court addressed the applicability of § 9607(a)(2) and the Secured Creditor Exemption to this case. As the first federal court of appeals to interpret the Secured Creditor Exemption, the *Fleet Factors II* court explained that, because of the "overwhelmingly remedial" goal of CERCLA, the exemption should be construed to favor liability. *Id.,* 901 F.2d at 1557. The court acknowledged that the financial community likely would cite this construction of the exemption as a serious impediment to lending, but went on to explain that any such apocalyptic concerns were ill-founded. *Id.*[9] The response to this decision prompted debate in

---

**6.** The standard under CERCLA is strict liability, *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir.1988), and joint and several liability, *Monsanto Co.*, 858 F.2d at 171; *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 810–11 (S.D.Ohio 1983).

**7.** In the case of an onshore facility, § 9601(20)(A) defines the term "owner or operator" simply as "any person owning or operating such facility...."

**8.** Fleet's first Motion for Summary Judgment, like its motion now under consideration, pointed to the Secured Creditor Exemption as protecting it from any liability as a § 9607(a) owner or operator.

**9.** As the *Fleet Factors II* Court explained:

Our ruling today should encourage potential creditors to investigate thoroughly the waste treatment systems and policies of potential debtors. If the treatment systems seem inadequate, the risk of CERCLA liability will be weighed into the terms of the loan agreement. Creditors, therefore, will incur no greater risk

Congress and, after a comment period, the Environmental Protection Agency's ("EPA") interpretation of the Secured Creditor Exemption. *See* 40 C.F.R. § 300.1100 ("Lender Liability Rule").

### 1. The Standard

■ Resolution of the Motions for Summary Judgment in issue here requires a meshing of the *Fleet Factors II* decision and the EPA's interpretation, as provided in the Lender Liability Rule, of CERCLA's Secured Creditor Exemption. Without question, this Court is bound to follow the Eleventh Circuit Court of Appeals' direction. Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), however, when a statute is silent or ambiguous concerning an issue, the courts must give deference to an administrative agency's reasonable interpretation of that statute. *See Wagner Seed Co. v. Bush,* 946 F.2d 918, 920 (D.C.Cir.1991) (applying *Chevron* to EPA interpretation of CERCLA and explaining proper application of *Chevron* ), *cert. denied,* —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992).[10] The specific scope of the Secured Creditor Exemption is ambiguous and EPA administers CERCLA,[11] *id.;* therefore, deference to EPA's interpretation of the Lender Liability Rule is warranted if that interpretation is reasonable. Because its reasonableness is not questioned here, the new rule warrants deference to the extent it conflicts with *Fleet Factors II.* In short, however, there is no direct conflict—the

Lender Liability Rule simply elaborates on several questions left unanswered by the *Fleet Factors II* opinion.

■ Before turning to the Lender Liability Rule, it is important to note that *Fleet Factors II* recognized two possible theories for secured creditor liability but conducted its analysis under one of those theories only. The two theories recognized in *Fleet Factors II* may be termed "conventional" operator liability and "management participation" liability. Both conventional and management participation liability are derived from the § 9601(20)(A) definition of "operator" with its associated secured creditor carve-out, and they are closely related.[12] As explained by the court:

> Although similar, the phrase 'participating in the management' and the term 'operator' are not congruent. Under the standard we adopt today, a secured creditor may incur section 9607(a)(2) liability, without being an operator, by participating in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous wastes.

*Fleet Factors II,* 901 F.2d at 1557 (footnote omitted). In other words, under the management participation theory, a secured creditor can be held liable even though its level of involvement is insufficient to warrant finding it in actual control of the borrower's day-to-day operations.[13] Recognition of this distinc-

than they bargained for and debtors, aware that inadequate hazardous waste treatment will have a significant adverse impact on their loan terms, will have powerful incentives to improve their handling of hazardous wastes. *Fleet Factors II,* 901 F.2d at 1558.

10. *See also Mead Corp. v. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989).

11. For a detailed explanation of how the President delegated to EPA his authority to administer CERCLA, see *Bush,* 946 F.2d at 920.

12. *See Fleet Factors II,* 901 F.2d at 1556 n. 6.

13. This distinction between the conventional and management participation theories is derived from *United States v. Kayser–Roth Corp.,* 724 F.Supp. 15, 20–21 (D.R.I.1989), *aff'd* 910 F.2d 24 (1st Cir.1990), *cert. denied,* 498 U.S. 1804, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), and appar-

ently is intended to impose liability where a secured creditor affects or controls hazardous substance operations even when its involvement is not so pervasive that it can be deemed in control of day-to-day activities. *Cf. Fleet Factors II,* 901 F.2d at 1558 (explaining when a secured creditor is liable under management participation theory). In *Kayser–Roth,* the court explained two available theories for holding a parent corporation responsible for the CERCLA liability of its wholly owned subsidiary. The first is that the Secured Creditor Exemption's use of the phrase "without participation in management" implies that one who holds indicia of ownership (in *Kayser–Roth,* as a stockholder) is liable irrespective of its involvement in operational details if it actually did *participate* in the management of the facility in issue. *Kayser–Roth* 's second theory is that any entity associated with a facility may be held liable if it *controls* the facility's operation and management.

tion is important here because the *Fleet Factors II* analysis was made under the management participation theory only. *See Fleet Factors II*, 901 F.2d at 1556 n. 6 ("In order to avoid repetition, and because this case fits more snugly under a secured creditor analysis, we will forgo an analysis of Fleet's liability as an operator").

Although *Fleet Factors II* does not explain fully the type and level of involvement necessary to incur management participation liability, it partially does so by focusing on a secured creditor's influence over the borrower. As the Court stated in dicta:

> It is not necessary for the secured creditor actually to involve itself in the day-to-day operations of the facility in order to be liable—although such conduct will certainly lead to the loss of the protection of the statutory exemption. Nor is it necessary for the secured creditor to participate in management decisions related to hazardous waste. Rather, *a secured creditor will be liable if* its involvement with the management of the facility is sufficiently broad to support the inference that it could affect hazardous waste disposal decisions if it so chose.

*Id.,* at 1557–58 (footnote omitted) (emphasis supplied).[14]   In establishing this standard, the Court made no apologies for the burden it placed on lenders; in fact, the Court went on to explain its reasons for concluding that such a burden is appropriate and carries beneficial consequences. *See id.,* at 1558–59.

Much of the discussion that followed *Fleet Factors II* arose from the perception that its standard imposes liability for the bare, unacted-upon *capacity* to influence hazardous substance decisions. Given certain portions of that opinion's language, particularly from those excerpts quoted above, the financial community's concern is understandable, but unwarranted. As pointed out in the preamble to the new Lender Liability Rule, 57 Fed.Reg. 18344–82, 18369 (1992) ("Preamble"), *Fleet Factors II* did not specifically establish a rule of liability without actual involvement;[15] instead, *Fleet Factors II* simply explains that "a secured creditor will be liable *if its involvement* with the management of the facility is sufficiently broad to support the inference that it could affect hazardous waste disposal decisions if it so chose," *Id.,* 57 Fed.Reg. at 18369 (emphasis supplied). Left open is what level of involve-

---

Although participation in management certainly implies a lesser degree of involvement than control over management and operations, neither *Kayser–Roth* nor *Fleet Factors II* fully explain the proper application of the former theory. It is true that *Fleet Factors II* is of some assistance because its analysis was made under the management participation theory, *see Fleet Factors II*, 901 F.2d at 1556 n. 6; however, as is more fully explained below, that opinion left open certain critical questions. Fortunately, the Preamble to the Lender Liability Rule directly addresses this distinction (including its origin) and interprets it simply as recognizing the need to hold liable a secured creditor who either (1) acts as a day-to-day manager or (2), without acting as a day-to-day manager, otherwise "directly affects or controls the facility's hazardous substance handling or disposal practices," Preamble to Lender Liability Rule, 57 Fed.Reg. at 18359. Accordingly, EPA incorporated both the conventional and management participation theories into the Lender Liability Rule's general test for management participation. *See* 40 C.F.R. §§ 300.1100(c)(1)(i–ii).

This interpretation is not directly supported by the language in *Fleet Factors II* or the related cases, but it is reasonable and consistent with the CERCLA policy of imposing liability on those responsible for creating hazardous waste problems. Furthermore, adoption of this interpreta-

tion is consistent with EPA's, *see* Preamble, 57 Fed.Reg. at 18369, and this Court's conclusion that the Lender Liability Rule is a congruent extension of *Fleet Factors II* and the remaining case law interpreting the Secured Creditor Exemption.

14. Significantly, the Court qualified this statement by explaining:

> Nothing in our discussion should preclude a secured creditor from monitoring any aspect of a debtor's business. Likewise, a secured creditor can become involved in occasional and discrete financial decisions relating to the protection of its security interest without incurring liability.

*Fleet Factors II,* 901 F.2d at 1558.

15. *Cf. In re Bergsoe Metal Corp.,* 910 F.2d 668, 673 n. 3 (9th Cir.1990):

> As did the Eleventh Circuit in *Fleet Factors*, we hold that a creditor must, as a threshold matter, exercise *actual* management authority before it can be held liable for action or inaction which results in the discharge of hazardous wastes. Merely having the power to get involved in management, but failing to exercise it, is not enough.

(emphasis supplied).

ment is sufficient—it is that question towards which the Lender Liability Rule is directed.[16] Preamble, 57 Fed.Reg. at 18369.

The Lender Liability Rule addresses the *Fleet Factors II* question by defining and elaborating on the Secured Creditor Exemption's key phrases—"indicia of ownership," "primarily to protect a security interest," and "participation in management," *see* 40 C.F.R. § 300.1100(a)–(c)—and by identifying a range of specific activities a secured creditor may engage in without exposing itself to liability.[17] The rule accomplishes the latter task by subdividing a secured creditor's actions into four categories: (1) actions at the inception of the loan or other transaction, (2) policing of the loan, (3) work-out, and (4) foreclosure and post-foreclosure activities.[18] The rule also establishes a general test for "participation in management" that applies to the first three categories. *See* 40 C.F.R. § 300.-1100(c)(1) ("General Test"). For the fourth category, foreclosure and post-foreclosure, the rule devotes a separate subsection to establishing a framework of permissible activities; however, to avail itself of the foreclosure provisions, a secured creditor must not have "participated in management," as defined by the General Test, prior to foreclosure.[19]

Before applying the Lender Liability Rule, review of certain central themes and elements is appropriate. First, through the Lender Liability Rule, EPA sought to achieve Congress' intent that secured creditors be protected when engaged only in the normal course of their business. *See* Preamble, 57 Fed.Reg. at 18366, 18376.[20] Second, EPA views the rule as consistent with the existing case law interpreting the Secured Creditor Exemption;[21] in fact, the Preamble contains a separate section devoted solely to explaining that the rule is not an attempt to overrule administratively *Fleet Factors II*, but rather is an extension of that opinion. *See Id.* at 18369. Also, in response to the understandable concern of the financial community, the General Test expressly states that participation in management requires *actual* participation and "does not include the mere capacity to influence, or ability to influence, or the unexercised right to control facility operations." 40 C.F.R. § 300.1100(c)(1). Only what a secured lender actually does, not what it has the right or ability to do, is relevant. Preamble, 57 Fed.Reg. at 18360 (citing *In re Bergsoe Metal Corp.*, 910 F.2d at 672).

Elaborating further on this actual involvement requirement, the Preamble explains a critical distinction concerning the capacity to influence. This distinction (made in explaining the General Test) is between a secured creditor who, acting as an outsider, can exercise even considerable influence over a borrower from one who "*actually exercises* decisionmaking control over the facility's operations from *within the facility's hierarchy....*" Preamble, 57 Fed.Reg. at 18359 (emphasis supplied). Only the latter situation warrants liability under the rule. This

---

**16.** No doubt, many in the financial community considered this to be the "Question of Questions." *See* Sir Thomas Carlyle, *Sartor Resartus: The Life and Opinions of Herr Teufelsdrockh* (Charles F. Harrold ed., New York, The Odyssey Press copyright 1932).

**17.** The specific activities listed in the Lender Liability Rule are "based on caselaw construing the exemption and on input from the commenters." Preamble, 57 Fed.Reg. at 18375–76.

**18.** For a thorough and readable explanation of the Lender Liability Rule's provisions, see 57 Fed.Reg. 18374–82.

**19.** EPA explained the rule's intended function as follows:

The Agency is issuing this rule to define and interpret the provisions of sections 101(20) and

101(35) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) ... as they affect persons maintaining indicia of ownership in a facility primarily to protect a security interest, which includes private and governmental lending institutions or entities, or which guarantee loans secured by a facility contaminated by or containing hazardous substances, or which acquire title to or ownership of contaminated property by an involuntary transfer or acquisition.

*Id.* at 18344. *See also id.* at 18346 (elaborating).

**20.** Quoting *Fleet Factors II*, 901 F.2d at 1556 (the purpose of the exemption is to protect "lenders from being exposed to CERCLA liability for engaging in their normal course of business").

**21.** *See* Preamble, 57 Fed.Reg. at 18359 (General Test largely conforms to existing case law).

is true because a secured creditor exercising influence as an outsider is analogous to "customers, suppliers, insurers, unions, and even the government," *id.*—none of whom are liable under CERCLA solely for exercising their influence.

Finally, several comments concerning the meshing of *Fleet Factors II* and the Lender Liability Rule are warranted. When reading *Fleet Factors II*, it is important to note that the appellate court's attention was directed only to Fleet's Motion for Summary Judgment—not towards establishing a comprehensive test with which all Secured Creditor Exemption issues could be resolved.[22] As the first court of appeals to interpret the exemption, the Eleventh Circuit certainly sought to provide guidance; however, too strict a reading of its dicta would be a disservice to the court and to the exemption. Also, it is important to recognize that the rule incorporates both of the *Fleet Factors II* theories of secured creditor liability.

■ As interpreted by this Court and EPA, the function of the two *Fleet Factor II*

theories[23]—conventional and management participation—is to impose liability when the secured creditor either (1) acts as a day-to-day manager or (2), without acting as a day-to-day manager, otherwise "directly affects or controls the facility's hazardous substance handling or disposal practices," Preamble, 57 Fed.Reg. at 18359. The General Test imposes liability on a secured creditor involved in the day-to-day activities of the borrower, *see* 40 C.F.R. § 300.1100(c)(1)(ii), and on the secured creditor whose decisionmaking control is limited to hazardous substances issues, *see* *id.* § 300.1100(c)(1)(i). Thus, both the conventional and management participation theories are covered in the rule's definition of participation in management.

## 2. Application

Because the Lender Liability Rule is a consistent extension of *Fleet Factors II*, it is appropriate to apply that rule to decide whether Fleet is covered by the Secured Creditor Exemption[24] and thereby avoids liability under 42 U.S.C. § 9607(a)(2).[25] As

**22.** This Court's denial of the Government's Cross–Motion for Summary Judgment was not before the *Fleet Factors II* Court.

**23.** *See generally supra* note 14 and accompanying text.

**24.** Fleet bears the burden of showing it is covered by the Secured Creditor Exemption. *Fleet Factors II*, 901 F.2d at 1555–56. Some ambiguity surrounds this point because of the Lender Liability Rule's introductory comment that "[t]he plaintiff bears the burden of establishing that the defendant is an owner or operator," 40 C.F.R. § 300.1100, and the fact that the Secured Creditor Exemption is an exception to the definition of the term "owner or operator," *see* 42 U.S.C. § 9601(20)(A). Clarification is found, however, in the cases cited by *Fleet Factors II* in which the following general rule of statutory construction is set forth: the party relying on an exception to a statutory prohibition bears the burden of showing that it falls within the exception. *See United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md.1986) (applying rule to CERCLA secured creditor exemption and citing *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (applying rule in banking law context)).

**25.** As a preliminary matter, the Court rejects the Government's contention that *Fleet Factors II* completely closed the door to Fleet's availment

of the Secured Creditor Exemption. In *Fleet Factors II*, the Eleventh Circuit had before it only Fleet's appeal of the denial of its first Motion for Summary Judgment. The court, therefore, necessarily considered all evidence in the light most favorable to the Government. *See Fleet Factors II*, 901 F.2d at 1553. Thus, what the Eleventh Circuit held was that *if* the evidence then before it was viewed most favorably to the Government, then Fleet was not covered by the exemption. This Court's consideration of the Government's Motion for Summary Judgment, however, must be made viewing the evidence most favorably to Fleet—an entirely different kettle of fish. The Government's argument does, however, raise the issue of what affect the *Fleet Factors II* decision has on Fleet's second Motion for Summary Judgment.

*Fleet Factors II*, as discussed more thoroughly above, is consistent with the new Lender Liability Rule—the latter simply is more comprehensive. Given this, Fleet's second Motion for Summary Judgment stands on tenuous ground because the Eleventh Circuit already has ruled that Fleet falls outside the Secured Creditor Exemption. To survive, therefore, Fleet's second Motion for Summary Judgment must include undisputed facts not presented in its first motion. The record is replete with disputed facts concerning the applicability of the exemption, so the analysis here need not directly address whether Fleet's second motion is barred by *Fleet Factors II*.

alluded to above, the rule treats pre-foreclosure and post-foreclosure involvement differently. Accordingly, Fleet's activities are addressed in two parts: (1) the period after SPW ceased operations (February 1981 to May 1982) and (2) the period after Fleet foreclosed on SPW's inventory, equipment, and machinery (May 1982 to December 1983).[26]

### a. Pre-foreclosure

■ The Lender Liability Rule's general management participation test begins by emphasizing that actual participation, rather than the mere capacity to influence, is required. A secured creditor is within that definition if it exercises decisionmaking control over hazardous substance handling or disposal practices, or if it exercises control at a level comparable to that of a general manager. More specifically:

> A holder [secured creditor] is participating in management, while the borrower is still in possession of the vessel or facility encumbered by the security interest, only if the holder either:
>
> (i) Exercises decisionmaking control over the borrower's environmental compliance, such that the holder has undertaken responsibility for the borrower's hazardous substance handling or disposal practices; or
>
> (ii) Exercises control at a level comparable to that of a manager of the borrower's enterprise, such that the holder has assumed or manifested responsibility for the overall management of the enterprise encompassing the day-to-day deci-

sionmaking of the enterprise with respect to:

> (A) Environmental compliance or
>
> (B) All, or substantially all, of the operational[27] (as opposed to financial or administrative)[28] aspects of the enterprise other than environmental compliance.

40 C.F.R. § 300.1100(c)(1) ("General Test") (emphasis and footnotes supplied). The General Test is then followed by a list of permissible loan or transaction policing actions, see id. § 300.1100(c)(2)(ii)(A), and a list of permissible workout[29] actions, see id. § 300.1100(c)(2)(ii)(B).

It is undisputed that Fleet was involved with the goings-on at the SPW site during the pre-foreclosure period. The issue, however, is whether Fleet's actions during that period rose to a level such that it assumed or manifested responsibility as contemplated in the General Test. See § 300.1100(c)(1)(i)–(ii).[30] Given EPA's and the Eleventh Circuit's recognition that the Secured Creditor Exemption is intended to protect secured creditors engaged in the normal course of their business, consideration of this issue should include whether a reasonable factor facing Fleet's circumstances and acting primarily to protect its security interest would have engaged in the actions undertaken by Fleet. By analyzing Fleet's actions in this way, the Court does not intend to abrogate the provisions of the rule; instead, the reasonableness of Fleet's actions is included to ensure that the rule's provisions are interpreted to achieve Congress' intent that the Secured Creditor Exemption protect secured

---

**26.** Fleet's level of involvement before February 1981 is not in issue here. See *Fleet Factors II*, 901 F.2d at 1559.

**27.** "Operational aspects of the enterprise include functions such as that of a facility or plant manager, operations manager, chief operating officer, or chief executive officer." 40 C.F.R. § 300.1100(c)(1)(ii)(B).

**28.** "Financial or administrative aspects include functions such as that of a credit manager, accounts payable/receivable manager, personnel manager, controller, chief financial officer, or similar functions." *Id.* § 300.1100(c)(1)(ii)(B).

**29.** " '[W]ork Out' refers to those actions by which a holder, at any time prior to foreclosure and its equivalents, seeks to prevent, cure, or mitigate a default by the borrower or obligor, or to preserve, or prevent the diminution of, the value of the security." *Id.* § 300.1100.(c)(2)(ii)(B).

**30.** Although the following discussion principally cites the General Test, the Court's analysis included full consideration of the list of permissible loan or transaction policing actions and permissible work out actions in 40 C.F.R. § 300.1100(c)(2).

creditors involved in the normal course of their business.

The Government characterizes Fleet's pre-foreclosure actions as demonstrating Fleet's primary control over operations at the SPW site; it maintains Fleet controlled production and personnel decisions as well as disposal of hazardous waste decisions. Fleet responds by arguing that its actions during this period were no different from the period before February 1981 when the SPW plant was operational. It continues by noting that the Eleventh Circuit held its actions during the SPW plant operation period to be within the Secured Creditor Exemption's coverage.[31] Fleet also emphasizes that its actions were strictly financial and directed only at mitigating its damages—that is, in the normal course of its business as a factor.

The production and personnel decisions cited by the Government include claims that, without the approval of Horowitz or Newton, Fleet wired funds to SPW's payroll account and that SPW's payroll officer used a facsimile machine to affix Horowitz's signature to payroll checks for issuance to the skeleton crew remaining on site; that Fleet made all decisions concerning credit and price terms and the terms of shipment for all finished goods and for certain overage goods; that Fleet pre-approved all shipments of goods; that the sale of overage goods, chemicals, and empty drums required Fleet approval; and that Fleet decided when to terminate the skeleton crew of SPW employees.

Applying the General Test to the production and personnel allegations recited above, it is critical to note that Fleet must be shown to have extended its control *beyond the merely financial and administrative* aspects of SPW's operations, 40 C.F.R. § 300.-1100(c)(1)(ii)(B)—that is, it must be shown to have exercised manager-like control over day-to-day decisionmaking with respect to operational aspects, *id.* Also, Fleet must

have done more than occasionally involved itself with the operations of SWP. Subsections (i) and (ii) of the General Test require that the control exercised be so pervasive that the holder *demonstrated responsibility* for either environmental compliance, *see id.* § 300.1100(c)(1)(i), or day-to-day decision-making with respect to either environmental compliance or "[a]ll, or substantially all, of the operational ... aspects of the enterprise ...," *see id.* § 300.1100(c)(1)(ii).

Considering these standards and reading the evidence in the light most favorable to Fleet, I cannot say as a matter of law that Fleet participated in the management of SPW as contemplated by the Lender Liability Rule. Fleet's presence certainly was felt during the pre-foreclosure period; however, the voluminous materials presented by the parties leave many questions unanswered. Specifically, Fleet's supporting materials raise the possibility that its involvement in daily operations was much more limited than the Government's facts suggest. Fleet will carry a heavy burden at trial, but it defeats the Government's Motion for Summary Judgment on this issue by sufficiently raising the possibility that its actions only were in the normal course of its business. As an aside, it obviously follows from the above that Fleet is not entitled to summary judgment in its favor on this issue.

The claim that Fleet controlled decisions concerning hazardous waste is the second area relied upon by the Government to show Fleet's pre-foreclosure participation in management. Specifically, the Government maintains that Newton received an offer for the purchase of certain marketable chemicals at the SPW site, was instructed not to sell without Fleet approval, and never received such permission—"everything just dissipated into thin air." Whether or not citation to this one act is sufficient to show Fleet's

---

31. As explained in *Fleet Factors II:*

From 1976 until SPW ceased printing operations on February 27, 1981, Fleet's involvement was within the parameters of the secured creditor exemption to liability. During this period, Fleet regularly advanced funds to SPW against the assignment of SPW's accounts re-ceivable, paid and arranged for security deposits for SPW's Georgia utility services, and informed SPW that it would not advance any more money when it determined that its advanced sums exceeded the value of SPW's accounts receivable.

*Fleet Factors II,* 901 F.2d at 1559.

responsibility for SPW's hazardous substance handling, Fleet's amply supported dispute of these facts precludes my ruling on the issue.

### b. Post-foreclosure

A secured creditor's post-foreclosure actions are covered in a separate subsection of the Lender Liability Rule. *See* 40 C.F.R. § 300.1100(d) (Foreclosure on Property and Post–Foreclosure Activities). Under this subsection, a secured creditor is given considerable leeway to wind-up a facility's operations and dispose of the foreclosed-upon assets without losing the Secured Creditor Exemption's protection. After foreclosure:

> A holder ... may sell, re-lease property held pursuant to a lease financing transaction ..., liquidate, maintain business activities, wind up operations,[32] ... and take measures to preserve, protect or prepare the secured asset prior to sale or other disposition. The holder may conduct these activities without voiding the exemption, subject to the requirements of 40 C.F.R. 300.1100(d)(1) and 300.1100(d)(2).

*Id.* § 300.1100(d)(2) (footnote supplied).[33] These foreclosure provisions, however, are available only if the secured creditor promptly attempts to divest itself of the foreclosed upon property, *id.* § 300.1100(d)(1), and did not participate in management before foreclosure, *id.; id.* § 300.1100(d)(2). As explained above, however, whether Fleet participated in management before foreclosure is an issue to be resolved at trial. Accordingly, it cannot be said as a matter of law that the provisions of § 300.1100(d) apply to Fleet.

■ Although applicability of the rule's foreclosure provisions is uncertain for the reason above, one point may be decided here. The Government asserts that Fleet's failure to foreclose on the SPW real property bars application of this subsection. Despite the Government's accurate observation that Fleet never foreclosed on the SPW real property, Fleet is covered by the foreclosure provisions of § 300.1100(d) because it foreclosed on the SPW inventory, equipment, and machinery. It is true that the rule does not specifically embrace the foreclosure of only inventory, equipment, and machinery, but it is equally true that the rule does not restrict itself to real property. Furthermore, adoption of the Government's argument would violate Congress' intent in creating the Secured Creditor Exemption because, as here, it sometimes is in the normal course of a secured creditor's business to foreclose on the inventory, equipment, and machinery only. *Cf.* Preamble, 57 Fed.Reg. at 18344 n. 2 (recognizing that the CERCLA definition of facility "includes real property as well as any equipment or other articles of personal property ...").

As a practical matter, a secured creditor's ability to dispose of its foreclosed-on assets under such circumstances requires that it be allowed to exercise some control over the unforeclosed-on real property as well.[34] In keeping with the "overwhelmingly remedial" goals of CERCLA, however, the extent of control over the unforeclosed-on real property allowed should be limited to that necessary for protection and disposal of the foreclosed-on assets. Significantly, the secured creditor's control over the unforeclosed-on real property should be limited both as to scope—only over those portions of the real property necessary for protection and disposal of foreclosed-on assets[35]—and time—the

---

32. "'Winding up' in the post foreclosure context includes those actions that are necessary to close down a facility's operations, secure the site, and otherwise protect the value of the foreclosed assets for subsequent sale or liquidation." Preamble, 57 Fed.Reg. at 18379. "Such activities are considered part of what 'lenders [do when] engaging in their normal course of business.'" *Id.* (quoting *Fleet Factors II*, 901 F.2d at 1556).

33. For a thorough discussion of the Lender Liability Rule foreclosure provisions, see Preamble, 57 Fed.Reg. 18377–79.

34. For example, to auction off the foreclosed-on assets.

35. *Cf.* Preamble, 57 Fed.Reg. at 18378–79 (noting the propriety of taking certain actions with respect to a facility "to protect or preserve the value of the secured asset").

real property must be vacated in a reasonably expeditious manner, *cf.* 40 C.F.R. § 300.1100(d)(1) (requiring divestment of foreclosed on assets in a reasonably expeditious manner). Whether Fleet complied with these requirements must be resolved at trial along with the participation in management issue noted above.

### B. Section 9607(a)(3) "Arranged for Disposal" Liability

Two issues arise concerning Fleet's potential liability under CERCLA for having "arranged" disposal of hazardous substances as contemplated in 42 U.S.C. § 9607(a)(3): (1) whether the Government's § 9607(a)(3) claim is untimely made and (2) whether Fleet's post-foreclosure actions, particularly its liquidation auction and its agreement with Nix, qualify as "arranging for the disposal" of hazardous substances. For the reasons stated below, the Government's § 9607(a)(3) allegations may be asserted and Fleet's § 9607(a)(3) liability must be decided at trial.

■ Fleet argues that the Government's "arranged for" claim is untimely asserted because it first was set forth in the Government's second Motion for Summary Judgment, filed almost five years after the Complaint. The Government responds that, although the specific paragraph in the Complaint directed toward Fleet speaks only in terms of § 9607(a)(2), the Complaint's preliminary claims for relief assert liability under § 9607(a) generally. On that basis and because it encompasses the same operative facts as the § 9607(a)(2) claims already dissected, the Government argues that its "arranged for" claim satisfies the liberal notice pleading requirements of Fed.R.Civ.P. 8(a).

Considering the Complaint's general § 9607(a) claim for relief and the unusual procedural history of this case caused by promulgation of the Lender Liability Rule, the Government may assert its § 9607(a)(3) claim against Fleet. The Complaint unquestionably put Fleet on notice of its potential liability under CERCLA § 9607(a)(2), and, through its general claim for relief, at least

gave some minimal notice that the Government's assertion of liability might not be limited strictly to § 9607(a)(2). Furthermore, Fleet conducted extensive discovery and appears well versed on the situation at the SPW site. Given the similarity of facts on which the §.9607(a)(2) and § 9607(a)(3) claims are based, it does not appear that Fleet will be prejudiced unduly by allowing this claim. Also, as is obvious from the parties' second round of Motions for Summary Judgment, promulgation of the Lender Liability Rule significantly changed the character of this case. Therefore, under these specific circumstances, the Government's strategy adjustment is understandable. The Government may proceed under § 9607(a)(3).

■ Section 9607(a)(3) brings within CERCLA's scope "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances...." Although CERCLA's provisions define "disposal" and "treatment," *see* 42 U.S.C. § 9601(29), they do not define "arranged for." Under existing case law, however, several points concerning the term "arranged for" are established: the term must be interpreted liberally to effectuate CERCLA's "overwhelmingly remedial" intent, *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990); the defendant's characterization of a transaction is not controlling, *United States v. Aceto Agric. Chem. Co.*, 872 F.2d 1373, 1381 (8th Cir.1989); and the term requires either that the defendant had some "actual involvement in the decision to dispose" or that a sufficient nexus exists between the defendant and the hazardous substance such that an obligation to exercise control over disposal is present, *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992).

The Government's § 9607(a)(3) allegations arise from Fleet's agreements with Baldwin and Nix. It is undisputed that Fleet engaged Baldwin to prepare the SPW site for and conduct an auction of items left at the SPW plant. Likewise, it is undisputed that Fleet engaged Nix to clean up the plant

afterwards. Read liberally, the Government's argument is that these transactions were a subterfuge through which Fleet discarded at the SPW site certain unwanted, hazardous substance containing items. However, disputed facts (or at least ambiguous facts) concerning Baldwin's and Nix's activities preclude a finding here that either constituted an arrangement for disposal under § 9607(a)(3). *Cf. Santa Fe Pac. Realty Corp. v. United States*, 780 F.Supp. 687, 698 (E.D.Cal.1991) (declining to embrace either party's "arranged for" test and explaining that "resolution of the issue depends upon inferences to be drawn from facts and the weight accorded a given inference ...").[36]

## IV. CONCLUSION

For the reasons stated above, the United States' Motion for Summary Judgment is **DENIED**, and Fleet Factors Corporation's Motion for Summary Judgment is **DENIED**. It is **FURTHER ORDERED** that the United States may proceed against Fleet Factors Corporation on its 42 U.S.C. § 9607(a)(3) claim.

**AMENDED ORDER ENTERED.**[37]

---

**36.** *See generally United States v. Summit Equip. & Supplies, Inc.*, 805 F.Supp. 1422 (N.D.Ohio 1992) (plant operators liable under § 9607(a)(3) when they closed plants and auctioned used, surplus equipment containing hazardous substances; fact that equipment was in working order at time of sale did not preclude liability). *See also United States v. Conservation Chem. Co.*, 619 F.Supp. 162 (W.D.Mo.1985) (sale of lime slurry and fly ash by-products to neutralize and treat other hazardous substances at a hazardous waste site could constitute "arranging for disposal" of the lime slurry and fly ash); *New York v.*

*General Elec. Co.*, 592 F.Supp. 291 (N.D.N.Y. 1984) ("sale" of used transformer oil found to be disposal so as to render seller liable under CERCLA); and *United States v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill.1984) (corporation found liable when "sale" found to be motivated by seller's desire to dispose of chemicals).

**37.** This Order is an amended version of the Court's February 5, 1993, Order denying both Motions for Summary Judgment.